1   JEFFER MANGELS BUTLER & MITCHELL LLP
    ROBERT B. KAPLAN, P.C. (Bar No. 76950)
2   Two Embarcadero Center, Fifth Floor
    San Francisco, California  94111-3813
3   Telephone:     (415) 398-8080
    Facsimile:      (415) 398-5584
4
    Attorneys for Plaintiffs Wells Fargo Bank, N.A., as Trustee for (i)
5   the Registered Holders of GE Commercial Mortgage Corporation
    Commercial Mortgage Pass-Through Certificates, Series 2005-C4;
6   (ii) the Registered Holders of GMAC Commercial Mortgage
    Securities, Inc., Mortgage Pass-Through Certificates, Series 2006-
7   C1; and (iii) the Holders of COMM 2005-FL11 Commercial
    Mortgage Pass-Through Certificates, acting by and through
8   CWCapital Asset Management, LLC, its Special Servicer

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11  WELLS FARGO BANK, N.A., as Trustee, etc.,   CASE NO.     CV 10-3493 EMC

12              Plaintiffs,                      **ORDER APPROVING STIPULATION FOR
                                                ORDER INSTRUCTING RECEIVER TO
13        v.                                    SELL REAL PROPERTY ASSETS OF
                                                RECEIVERSHIP ESTATE AND
14  DDR MDT MV ANAHEIM HILLS LP, etc., et       CONFIRMING SALE OF REAL
    al.,                                        PROPERTY FREE AND CLEAR OF LIENS
15                                              [GARDEN GROVE]**
                Defendants.
16

17

18            The Court, having reviewed the Stipulation for Order Instructing Receiver to Sell

19  Real Property Assets of Receivership Estate and Confirming Sale of Real Property Free and Clear

20  of Liens ("Stipulation") filed by Plaintiffs Wells Fargo Bank, N.A., as Trustee for (i) the Registered

21  Holders of GE Commercial Mortgage Corporation Commercial Mortgage Pass-Through

22  Certificates, Series 2005-C4; (ii) the Registered Holders of GMAC Commercial Mortgage

23  Securities, Inc., Mortgage Pass-Through Certificates, Series 2006-C1; and (iii) the Holders of

24  COMM 2005-FL11 Commercial Mortgage Pass-Through Certificates (in that capacity, collectively,

25  the "Noteholders" or the "Plaintiffs"), acting by and through CWCapital Asset Management, LLC,

26  its Special Servicer, through their attorneys of record Robert B. Kaplan of Jeffer Mangels Butler &

27  Mitchell LLP and Defendants DDR MDT MV Anaheim Hills LP, DDR MDT MV Antioch LP,

28  DDR MDT MV Chandler LLC, DDR MDT MV Chino LP, DDR MDT MV Clovis LP, DDR MDT

MV Deer Valley LLC, DDR MDT MV Folsom LP, DDR MDT MV Foothill Ranch LP, DDR MDT

MV Garden Grove LP, DDR MDT MV Ingram LP, DDR MDT MV Lompoc LP, DDR MDT MV

Madera LP, DDR MDT MV North Fullerton I LP, DDR MDT MV Palmdale LP, DDR MDT MV

Redding LP, DDR MDT MV Reno LLC, DDR MDT MV Santa Maria LP, DDR MDT MV Santa

Rosa LP, DDR MDT MV Silver Creek LLC, DDR MDT MV Slatten Ranch LP, DDR MDT MV

Sonora LP, DDR MDT MV Superstition Springs LLC, DDR MDT MV Tucson LLC, DDR MDT

MV Tulare LP, DDR MDT MV West Las Vegas LLC, each, a Delaware limited partnership or a

Delaware limited liability company, as indicated, and DDR MDT MV Burbank LP, a Delaware

limited partnership, (collectively, the "Defendants" or "Borrowers" and individually, a "Defendant"

or "Borrower"), through their attorneys of record Stephen Kaus, Esq. and Cooper White & Cooper,

LLP and good cause appearing therefor:

       IT IS HEREBY ORDERED as follows:[1]

    1.    The Stipulation is hereby approved.

    2.    The Receiver is instructed, authorized and ordered to forthwith complete the sale of the Garden Grove Property pursuant to the terms of the Garden Prove PSA, a true and correct copy of which is attached hereto as <u>Exhibit A</u> and incorporated by this reference as though set forth in full.

    3.    The transfer and conveyance of the Garden Grove Property by the Receiver shall, as more specifically set forth in the Garden Grove PSA, be in an "as is" condition, without representations or warranties of any kind except as expressly and specifically set forth in the Garden Grove PSA.

    4.    The Receiver is authorized to execute closing documents and to satisfy the closing requirements as required by the Garden Grove PSA.

///

---

[1] All terms capitalized herein but not defined shall have the meanings ascribed to them in that certain Stipulation for Order Instructing Receiver to Sell Real Property Assets of Receivership Estate and Confirming Sale of Real Property Free and Clear of Liens previously filed in the above-entitled action.

PRINTED ON
RECYCLED PAPER
SF 1261704v3

JMBM | Jeffer Mangels Butler & Mitchell LLP

5.      The Buyer shall take good and clear title to the Garden Grove Property sold by the Receiver and the sale and transfer of the Garden Grove Property to the Buyer is made free and clear of any liens of the Plaintiffs, all of which liens are extinguished upon sale and transfer of the Garden Grove Property.

6.      All liens of the Plaintiffs shall attach to the proceeds of sale of the Garden Grove Property and shall be paid at the time of the closing of the escrow for the sale of the Garden Grove Property pursuant to the Garden Grove PSA to the Plaintiffs directly from escrow.

7.      The Receiver shall be authorized to pay a commission to Ferris Lee Investments pursuant to Section 5.3 of the Garden Grove PSA at the time of the closing of escrow for the sale of the Garden Grove Property directly from escrow.

8.      The Defendants, and each of them, consent to and approve of the sale of the Garden Grove Property to the Buyer as set forth in the Garden Grove PSA and waive any right which they may have to appeal from this Order pursuant to the Federal Rules of Appellate Procedure or otherwise including, without limitation, Federal Rule of Appellate Procedure 3 and Federal Rule of Appellate Procedure 4.

DATED:  December ____, 2011
                               23



UNITED STATES _____ RT JUDGE

IT IS SO ORDERED

Judge Edward M. Chen

ORDER APPROVING STIP FOR ORDER
                                                                        INSTRUCTING ETC. [GARDEN GROVE]

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
SF 1261704v3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

**EXHIBIT A**

ORDER APPROVING STIP FOR ORDER
INSTRUCTING ETC. [GARDEN GROVE]

<u>PURCHASE AND SALE AGREEMENT</u>

between

**WILLIAM J. HOFFMAN,**
as the Receiver,
as the Seller

and

**NEARON ENTERPRISES, LLC**
a California limited liability company,
as the Purchaser

Dated as of
December 1, 2011

**For Property Located at**
**13092 Harbor Boulevard**
**City of Garden Grove, Orange County, State of California**

# TABLE OF CONTENTS

Page

1.  PROPERTY ..................................................................................... 2
    1.1   Description ........................................................................... 2
    1.2   Agreement to Convey ........................................................ 2
2.  PURCHASE PRICE AND PAYMENT ........................................ 3
    2.1   Purchase Price ..................................................................... 3
    2.2   Deposit .................................................................................. 3
    2.3   Payment ................................................................................ 3
    2.4   Closing ................................................................................. 3
    2.5   Special Receiver Provisions .............................................. 3
3.  INSPECTIONS AND APPROVALS .......................................... 5
    3.1   Inspections .......................................................................... 5
    3.2   Access to Property and Indemnification by Purchaser ... 5
    3.3   Inspection of Documents .................................................. 6
    3.4   Survey ................................................................................... 7
    3.5   Title Commitment .............................................................. 8
    3.6   Purchaser's Acceptance or Rejection Prior to Expiration of Due Diligence
          Period ................................................................................... 9
    3.7   Contracts .............................................................................. 10
    3.8   Permitted Exceptions ....................................................... 10
    3.9   Natural Hazards Disclosure .............................................. 11
4.  SELLER'S OBLIGATIONS PRIOR TO CLOSING ................... 11
    4.1   Insurance .............................................................................. 11
    4.2   Operation ............................................................................. 11
    4.3   Notices .................................................................................. 11
    4.4   Compliance with Agreements ......................................... 11
    4.5   New Contracts ..................................................................... 12
    4.6   Leases ................................................................................... 12
5.  REPRESENTATIONS AND WARRANTIES ............................ 12
    5.1   By Seller ................................................................................ 12
    5.2   By Purchaser ....................................................................... 13
    5.3   Broker .................................................................................... 14
    5.4   Property Condition ............................................................ 14
6.  CONDITIONS PRECEDENT TO CLOSING ............................ 17
    6.1   Conditions for Benefit of Purchaser ............................... 17
    6.2   Waiver of Conditions ......................................................... 18
    6.3   Conditions for Benefit of Seller ....................................... 18
    6.4   Waiver of Conditions ......................................................... 18
    6.5   Failure of a Condition ........................................................ 18
7.  CLOSING COSTS AND PRORATIONS .................................. 18
    7.1   Purchaser's Costs ............................................................... 18
    7.2   Seller's Costs ....................................................................... 19
    7.3   Prorations ............................................................................ 19
    7.4   Taxes ..................................................................................... 20
    7.5   In General ............................................................................ 21

i

**TABLE OF CONTENTS**
**(CONTINUED)**

Page

| | | | |
|---|---|---|---|
| | 7.6 | Purpose and Intent | 21 |
| 8. | | CLOSING AND ESCROW | 21 |
| | 8.1 | Seller's Deliveries | 21 |
| | 8.2 | Purchaser's Deliveries | 22 |
| | 8.3 | Possession | 22 |
| | 8.4 | Escrow Closing | 22 |
| | 8.5 | Special Receiver Provisions | 23 |
| 9. | | DAMAGE, DESTRUCTION AND CONDEMNATION | 25 |
| | 9.1 | Casualty | 25 |
| | 9.2 | Condemnation | 25 |
| 10. | | FAILURE OF CONDITIONS PRECEDENT; DEFAULT AND REMEDIES | 26 |
| | 10.1 | Failure of Conditions Precedent | 26 |
| | 10.2 | Purchaser Default | 26 |
| | 10.3 | Liquidated Damages | 27 |
| | 10.4 | Seller Default | 27 |
| | 10.5 | Termination | 27 |
| | 10.6 | Attorneys' Fees | 28 |
| 11. | | NOTICES | 28 |
| 12. | | MISCELLANEOUS | 29 |
| | 12.1 | Entire Agreement | 29 |
| | 12.2 | Severability | 30 |
| | 12.3 | Applicable Law | 30 |
| | 12.4 | Assignability | 30 |
| | 12.5 | Successors Bound | 30 |
| | 12.6 | No Public Disclosure | 30 |
| | 12.7 | Captions; Interpretation | 30 |
| | 12.8 | No Partnership | 30 |
| | 12.9 | Time of Essence | 30 |
| | 12.10 | Counterparts | 31 |
| | 12.11 | Recordation | 31 |
| | 12.12 | Proper Execution | 31 |
| | 12.13 | Waiver | 31 |
| | 12.14 | Business Days | 31 |
| | 12.15 | Limitation of Liability | 31 |
| | 12.16 | Back-Up Contracts | 31 |
| | 12.17 | Jurisdiction and Venue | 31 |
| | 12.18 | Reference | 32 |
| | 12.19 | Waiver of Jury Trial | 32 |
| | 12.20 | Prohibited Persons and Transactions | 32 |
| | 12.21 | Execution; Counterparts | 33 |
| | 12.22 | Tax-Free Exchange | 33 |
| 13. | | ESCROW AGREEMENT | 34 |
| | 13.1 | Deposit | 34 |
| | 13.2 | Title Company | 34 |
| | 13.3 | Indemnity | 34 |

ii

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") dated as of December 1, 2011 (the "**Effective Date**"), is made by (a) NEARON ENTERPRISES, LLC, a California limited liability company, having an address of 500 La Gonda Way, Suite 210, Danville, California 94526 (the "**Purchaser**"); (b) WILLIAM J. HOFFMAN, not in his individual capacity but solely in his capacity as the Receiver (defined in Recital Paragraph B), having an address at 12707 High Bluff Drive, Suite 300, San Diego, California 92130 (in that capacity, the "**Seller**"); and (c) FIRST AMERICAN TITLE INSURANCE COMPANY, through its NATIONAL COMMERCIAL SERVICES office located at 1825 Eye Street, NW, Suite 302, Washington, D.C. 20006 (the "**Title Company**").

<u>RECITALS</u>

A.    DDR MDT MV Garden Grove LP, a Delaware limited partnership (the "**Owner**"), owns certain improved real property located at 13092 Harbor Boulevard, City of Garden Grove, County of Orange, State of California, along with certain related property, all as more particularly described in Section 1 (Property) below.  Said real property is located in the Garden Grove Center and is occupied, in part, by Burlington Coat Factory of California, LLC ("**Credit Tenant**"), pursuant to an existing Lease Agreement between Owner and Credit Tenant dated May 17, 2010 (the "**Credit Tenant Lease**").

B.    The Seller is the duly appointed, qualified, and acting receiver (in that capacity, the "**Receiver**") in that certain action now pending in the United States District Court for the Northern District of California (the "**Court**") bearing Case No. CV 10-3493 and styled *Wells Fargo Bank, N.A., as Trustee, etc., v. DDR MDT MV Anaheim Hills, LP, etc., et al.* (the "**Action**"), pursuant to that certain Order Appointing Receiver Ex Parte and Preliminary Injunction in Aid of Receiver entered in the Action on August 24, 2010 (the "**Receiver Order**"; and the appointment and continuing authority and activities of the Receiver pursuant thereto, the "**Receivership**"). The Owner is one of the Defendants (as defined in the Receiver Order) in the Action and the Real Property (defined in Section 1.1.1) is one of the Subject Properties (as defined in the Receiver Order) that is subject to the Receiver Order. Pursuant to the Receiver Order, the Seller is authorized and directed, *inter alia*, (a) to be in possession, control, and charge of the Real Property and the other Property (as both are defined in Section 1.1 below); and (b) subject to approval by the Court, to sell the Property.

C.    The Seller desires to sell the Property to the Purchaser pursuant to the Receiver Order, and the Purchaser desires to purchase Property from the Seller pursuant thereto.

D.    The Seller and the Purchaser, intending to be bound by this Agreement, desire to set forth herein the terms, conditions, and agreements under and by which the Seller will sell and the Purchaser will purchase the Property.

SF 1225251v7

<u>AGREEMENTS</u>

NOW, THEREFORE, in consideration of the mutual agreements and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and the Purchaser agree as follows:

1.    **PROPERTY.**

1.1    <u>Description</u>. Subject to the terms and conditions of this Agreement, and for the consideration set forth herein, the Seller hereby agrees to sell, assign, and convey, and the Purchaser hereby agrees to purchase and acquire, all of the Owner's right, title, and interest in and to the following (collectively, the "**Property**"):

1.1.1    That certain parcel of land located in Orange County, California, having a street address of 13092 Harbor Boulevard, Garden Grove, California, and being more specifically described on Schedule 1.1.1 attached hereto (the "**Land**"), along with all buildings (collectively, the "**Building**") and all other improvements, parking facilities, and fixtures located on the Land (the Building and all other improvements located on the Land, collectively, the "**Improvements**"), and all easements, rights of way, hereditaments, appurtenances, development rights, and other benefits, if any, pertaining to or affecting the Land (collectively, the "**Easements**"; and  the Land, the Building, the Improvements, and the Easements, collectively, the "**Real Property**");

1.1.2    All furniture, furnishings, fixtures, equipment, and other tangible personal property affixed to or located at the Real Property owned by Owner and used in connection with the Real Property, or replacements of those items permitted pursuant to this Agreement (collectively, the "**Personal Property**");

1.1.3    Any and all Leases (defined in Section 4.6 (Leases)) and Contracts (defined in Section 3.7 (Contracts)) in effect on the Closing Date; and

1.1.4    Any and all permits, warranties, certificates of occupancy, telephone exchange numbers, architectural or engineering plans and specifications, and development rights that exist as of the Closing Date and relate to the Real Property or the Personal Property, if any, owned by the Owner, whether or not in the possession or control of Seller (collectively, the "**Intangible Property**").

1.2    <u>Agreement to Convey</u>. The Seller agrees to sell and convey, and the Purchaser agrees to purchase and accept, on the Date of Closing (defined in Section 2.4 (Closing)) (a) fee title to the Land and the Improvements by way of a grant deed, to be executed and delivered by the Seller in respect to the Real Property, and which shall be subject only to the Permitted Exceptions (defined in Section 3.8 (Permitted Exceptions)) affecting or encumbering the Real Property; and (b) the remainder of the Property, by way of the assignment agreements, quitclaim bill of sale, and other instruments of conveyance described in this Agreement.

2.   **PURCHASE PRICE AND PAYMENT**.

2.1   Purchase Price. The purchase price for the Property (the "**Purchase Price**") is Eight Million One Hundred Fifty-Five Thousand Six Hundred Twenty-Three and No/100 U.S. Dollars ($8,155,623.00).

2.2   Deposit.

2.2.1   Initial Deposit. Within two (2) business days immediately following the Effective Date, the Purchaser shall, by federal wire transfer, deposit the sum of Two Hundred Thousand and no/100 U.S. Dollars ($200,000.00) (the "**Initial Deposit**") into an escrow of the Title Company established for the purpose of consummating the transaction contemplated by this Agreement (the "**Escrow**"). If the Purchaser fails to make the Initial Deposit in accordance with the foregoing by 5:00 p.m., Washington, D.C., time, on the second business day immediately following the Effective Date, this Agreement shall automatically terminate and neither party shall thereafter have any further rights, obligations, or liability hereunder, except as otherwise expressly set forth herein.

2.2.2   Maintenance of Deposit. The Initial Deposit shall be held by the Title Company in an interest-bearing account. All interest earned on the Initial Deposit shall be added to the principal held in the escrow and shall constitute a part of the Deposit (hereinafter defined). The term "**Deposit**" as used herein shall mean the Initial Deposit and any additional deposits as are described herein, and all interest earned thereon. Interest earned on the Deposit shall be deemed earned by the Purchaser.

2.3   Payment. The Purchaser shall pay to the Seller the Purchase Price, on or before 3:00 p.m., Washington, D.C., time, on the Date of Closing, by causing the Title Company to wire the Purchase Price in immediately available funds to such bank account(s) as the Seller may designate. The Deposit shall be paid by the Title Company to the Seller at the Closing and credited against the Purchase Price. The Purchase Price shall also be subject to further adjustments for prorations and credits required to be made in accordance with Section 7 (Closing Costs and Prorations).

2.4   Closing. The purchase and sale of the Property shall be consummated at closing (the "**Closing**") the Escrow through the Title Company on the date (the "**Date of Closing**" or the "**Closing Date**") which is to be the thirtieth (30th) day immediately following expiration of the Due Diligence Period. The Closing shall occur on the Date of Closing at the offices of the Title Company, or at such other time and place as may be agreed to in writing by the Seller and the Purchaser.

2.5   Special Receiver Provisions. Nothing in this Agreement to the contrary withstanding—

2.5.1   Sale Free and Clear of Trusts' Liens; Application of Net Proceeds. Provided that the Trusts (as defined in the Receiver Order) are paid all net proceeds of the Purchase Price after payment of (a) the Seller's Closing Costs (defined in Section 7.2.1) and (b) commissions payable to the Seller's Broker (defined in Section 5.3 (Broker)), which net

proceeds are to be paid from the Escrow for application to the Loan (as defined in the Complaint (as defined in the Receiver Order)), the Seller shall cause the Property to be sold free and clear of any liens held by the Trusts that encumber the Property (those liens, collectively, the "**Free and Clear Liens**"), with the Free and Clear Liens to attach to the proceeds of the sale pursuant to the Sale Confirmation Order (defined in Section 2.5.2 (Sale Subject to Receiver Order and Sale Confirmation Order)) in order of priority of those liens. Without the necessity of any notice from the Purchaser that any of the Free and Clear Liens is a Disapproved Title Exception (defined in Section 3.5.1) as contemplated in Section 3.5.1, the Free and Clear Liens are deemed to be Disapproved Title Exceptions; without the necessity of any notice from the Seller that the Seller elects to cure those Disapproved Title Exceptions pursuant to Section 3.5.1, the Seller is deemed to have elected to cure the same; and, provided that the Title Company insures that the Property is, as of the Closing, free and clear of the Free and Clear Liens, the Free and Clear Liens will be deemed to be cured as of the Closing.

      2.5.2    <u>Sale Subject to Receiver Order and Sale Confirmation Order</u>. Pursuant to the Receiver Order, the sale of the Property is subject to the Receiver Order, including that the sale of the Property pursuant to this Agreement be approved and confirmed by the Court (the order of the Court so approving and confirming that sale and satisfying the other requirements for that order set out in Section 8.5.2 (Non-Approval of Sale Confirmation Motion), the "**Sale Confirmation Order**").

      2.5.3    <u>No Personal Liability</u>. The Purchaser, by execution and delivery hereof, hereby agrees that this Agreement and all documents executed and delivered in connection herewith are executed and delivered by the Receiver not in his own right, but solely in the exercise of the powers conferred on him as the Receiver by the Court by the Receiver Order. The Purchaser expressly acknowledges and agrees that no personal liability is assumed by, nor shall at any time be asserted or enforceable against, the Receiver, individually, on account of this Agreement or the documents executed and delivered in connection herewith. The Purchaser acknowledges and agrees that any liability of the Receiver provided for under this Agreement, whether in contract, tort, or otherwise, shall be limited to the assets of the receivership estate created by the Receiver Order and any insurance coverage maintained by the Owner or the Receiver in connection with the Property and the proceeds thereof, and the Purchaser shall have no recourse to any assets of the Receiver individually. The Purchaser hereby expressly releases and forever discharges the Receiver and his officers, directors, employees, agents, and representatives from any claims, liabilities, damages, or causes of action, of whatever nature, arising from or related to this Agreement or the Property. The Receiver shall have no personal liability for the payment of any amount or the performance of any obligation arising under or relating to this Agreement.

      2.5.4    <u>Receipt of Receiver Order</u>. The Purchaser acknowledges that the Property is owned by Owner but subject to the Receivership pursuant to the Receiver Order. The Purchaser acknowledges receipt of a copy of the Receiver Order as one of the Property Documents (defined in Section 3.3 (Inspection of Documents)), and represents and warrants that the Purchaser, if it has deemed it necessary in its sole discretion, has consulted with counsel regarding the effect of the Receiver Order and Sale Confirmation Order, if any.

2.5.5    Conflict with Court Orders. Notwithstanding any other provision in this Agreement, the Receiver shall have no obligation to perform in any manner under this Agreement that is contrary to or in excess of his powers and authority as described with particularity in the Receiver Order or any other order of the Court entered in the Action, and, if there is any conflict between the terms of this Agreement and the provisions of the Receiver Order or any such other order, the Receiver shall comply with the terms of the Court's orders. The provisions of this Section 2.5.5 shall survive the Closing.

3.    **INSPECTIONS AND APPROVALS.**

3.1    Inspections. The Purchaser shall have a period of time (the "**Due Diligence Period**"), commencing on the Effective Date, and expiring at 5:00 p.m., Washington, D.C., time, on that day which is the thirtieth (30th) day following the Effective Date, within which to conduct the inspections and studies described in this Section 3 (Inspections and Approvals).

3.2    Access to Property and Indemnification by Purchaser. During the Due Diligence Period, the Seller shall permit the Purchaser and the Purchaser's agents and representatives access to the Land and the Improvements for the purpose of conducting such physical and environmental inspections of the Land and the Improvements (collectively, the "**Inspections**") as the Purchaser shall deem necessary to determine the feasibility of the Land and the Improvements for the Purchaser's intended use. Before the Purchaser enters the Land or the Improvements to perform any Inspections, the Purchaser shall give the Seller reasonable advance written notice and, at the Seller's option, a representative of the Seller may accompany the Purchaser or the Purchaser's agents or representatives. The Purchaser agrees to be solely responsible for the conduct of the Purchaser's agents or representatives on and adjacent to the Land and the Improvements and shall assume and pay for all expenses incurred in connection with the Inspections. At all times during the presence of the Purchaser or the Purchaser's representatives on the Land and the Improvements, the Purchaser agrees that the Purchaser will not allow, and the Purchaser's agents or representatives will not conduct, any physically invasive testing of, on, or under the Land or the Improvements for any purpose. The Purchaser agrees to return the Land and the Improvements to substantially the same condition and cleanliness existing before entry or occupation by the Purchaser's agents or representatives, including sealing wells or other similar subsurface investigations. The Purchaser shall use reasonable efforts to minimize interference with the Seller's and any tenants' use and occupancy of the Building. In no event shall the Purchaser directly or indirectly contact any tenant or any employees of any tenant in the Building. The Purchaser shall keep confidential the information resulting from the Inspections until the Closing. Notwithstanding the immediately preceding, the Purchaser may disclose confidential information to the Purchaser's agents, representatives, lenders and partners and their respective representatives, to the extent each needs to know confidential information for the sole purpose of evaluating the Land and the Improvements, provided that the Purchaser takes all reasonable measures to assure that the Purchaser's agents, representatives lenders and partners and their respective representatives keep such information confidential. The Purchaser shall indemnify, defend, and hold the Seller, his officers, directors, employees, agents, and representatives, the Trusts, their respective shareholders, members, partners, beneficiaries, officers, directors, certificate holders, representatives, and agents, including CWCapital Asset Management LLC ("**CWCapital**"), the special servicer of the Loan

5

for the Trusts, and CWCapital's shareholders, members, partners, beneficiaries, officers, directors, and agents (all the foregoing, collectively, the "**Indemnified Parties**") harmless from any loss, injury, liability, damage, or expense, including reasonable attorneys' fees and costs, caused by the Purchaser, which an Indemnified Party may incur as a result of (a) any act or omission of the Purchaser or its agents or representatives arising in connection with any Inspections; or (b) the failure of the Purchaser to restore the Property in accordance with this Section 3.2 (Access to Property and Indemnification by Purchaser); provided, however, that the Purchaser shall not be required to indemnify the Seller if and to the extent that any such loss, injury, liability, damage, or expense was caused by the negligence or misconduct of the Seller or any of his officers, directors, employees, representatives, or agents. The foregoing shall survive termination of this Agreement or the Closing, as applicable. Furthermore, the Purchaser shall, at its sole expense, keep and maintain a policy of commercial general liability insurance with a contractual liability endorsement that covers the Purchaser's indemnity obligation set forth above. This insurance policy shall name the Seller, the Trusts, and CWCapital as an additional insureds and afford protection in limits of not less than Three Million Dollars ($3,000,000) for bodily injury or death in any one accident, and not less than Three Million Dollars ($3,000,000) for property damage. All insurance shall be effected under standard form policies, issued by insurers of recognized responsibility authorized to do business in California and having a national rating of A-XI or better. Within two (2) days after the Effective Date, the Purchaser shall deliver to the Seller certificates of such insurance coverage and, not less than thirty (30) days before the expiration of any such policy, a certificate of the renewal of such coverage accompanied by evidence reasonably satisfactory to the Seller of payment of premiums therefore. In addition, the insurance shall be primary, non-contributing, and contain a waiver of subrogation in favor of Seller, the Trusts, and CWCapital.

     3.3    Inspection of Documents. Within two (2) business days after the Effective Date, the Seller shall make available to the Purchaser or its agents or representatives, for inspection and copying, at the Building or some other location mutually convenient to the parties, the Property information materials relating to the Land and the Improvements set forth on Schedule 3.3 attached hereto (collectively, the "**Property Documents**"), to the extent such Property Documents exist and are within the Seller's possession. The Purchaser shall keep confidential the information contained in the Property Documents until the Closing. The Purchaser may disclose confidential information to the Purchaser's agents, representatives, lenders and partners and their respective representatives to the extent each needs to know confidential information for the sole purpose of evaluating the Property Documents, provided the Purchaser takes all reasonable measures to assure that the Purchaser's agents, representatives, lenders and partners and their respective representatives keep such information confidential.

     3.3.1    The Purchaser acknowledges, understands, and agrees that the Property Documents may have been prepared by parties other than the Seller and that the Seller makes no representation or warranty whatsoever, express or implied, as to the completeness, content, or accuracy of the Property Documents. The Purchaser specifically releases the Seller from all claims, demands, causes of action, judgments, losses, damages, liabilities, costs, and expenses (including attorney's fees, whether suit is instituted or not), whether known or unknown, liquidated or contingent (collectively,"**Claims**"), asserted against or incurred by the Purchaser by reason of the information contained in, or that should have been contained in, the Property

Documents. The provisions of this Section 3.3.1 shall survive the Closing, or the early termination of this Agreement.

3.3.2     Within three (3) business days after the Effective Date, the Seller shall submit to Burlington Coat Factory of California, LLC ("**Burlington**"), the current tenant occupying the Property pursuant to the Lease Agreement described in Schedule 4.6, a Tenant Estoppel Certificate in the form of Schedule 8.1.10 (the "**Tenant Estoppel Certificate**") and request that Burlington execute and deliver to the Seller a completed Tenant Estoppel Certificate with respect to such Lease Agreement before the end of the Due Diligence Period.  If, prior to the end of the Due Diligence Period, Burlington completes, signs and delivers the Tenant Estoppel Certificate to the Seller or fails to complete, sign and deliver the Tenant Estoppel Certificate to the Seller, then the Seller shall, no later than five (5) Business Days after the end of the Due Diligence Period, deliver to the Purchaser a written notice thereof (the "**Tenant Estoppel Notice**") and deliver to the Purchaser a true and complete copy of any completed and signed Tenant Estoppel Certificate received by the Seller.   If, before the end of the Due Diligence period, Burlington either does not deliver the Tenant Estoppel Certificate to the Seller or claims in the Tenant Estoppel Certificate that a breach or default has occurred under the Lease Agreement, then the Purchaser may nevertheless elect to proceed with the purchase of the Property by notifying the Seller in writing, no later than three (3) Business Days following the Seller's delivery of the Tenant Estoppel Notice, of the Purchaser's election to do so.  If the Purchaser fails to deliver to the Seller a notice of its election to proceed with the purchase of the Property as provided in this Agreement, then the Purchaser shall be deemed to have unconditionally and irrevocably elected to terminate this Agreement, whereupon the Purchaser's right and obligation to purchase the Property will automatically terminate (without any right on the part of the Purchaser to reinstate its right to purchase the Property hereunder), the Deposit will be delivered to the Purchaser, and neither party will have any further obligation or liability to the other party hereunder, except as otherwise expressly provided herein.   Upon the Purchaser's failure to deliver a written notice of the Purchaser's election to proceed with the purchase of the Property strictly within the time herein provided, the Seller may, but shall not be obligated to, deliver to the Purchaser and to the Title Company a written notice of termination of this Agreement, which notice may be conclusively relied upon by the escrow agent in cancelling the Escrow and in complying with the provisions of this Section.

3.4     Survey.

3.4.1     As part of the Property Documents, the Seller shall deliver the most recent survey, if any, in its possession to the Purchaser (the "**Existing Survey**"). The Purchaser shall have until 5:00 p.m. Washington, D.C., time on the date which is five (5) days after the Effective Date, at its sole cost and expense, to order an update to the Existing Survey (or if there is no Existing Survey, a new survey) for delivery to the Purchaser no later than fifteen (15) days after the Effective Date (the Existing Survey, as updated, or a new survey, the "**Survey**"). The Purchaser shall deliver a copy of the Survey to the Seller promptly following receipt thereof. On or before 5:00 p.m. Washington, D.C., time on the date which is twenty (20) days after the Effective Date, the Purchaser shall deliver to Seller, in writing, any objections to any matters shown on the Survey, which objections shall be delivered simultaneously with any objection to the Title Commitment (defined in 3.5.1) delivered pursuant to Section 3.5 (Title Commitment)

(collectively, the "**Objection Letter**"). The Purchaser's failure to timely deliver the Objection Letter shall be deemed to constitute the Purchaser's unconditional and irrevocable disapproval of the Survey and election to terminate this Agreement, whereupon the Purchaser's right and obligation to purchase the Property will automatically terminate (without any right on the part of the Purchaser to reinstate its right to purchase the Property hereunder), the Deposit will be delivered to the Purchaser, and neither party will have any further obligation or liability to the other party hereunder, except as otherwise expressly provided herein. Upon the Purchaser's failure to deliver an Objection Letter strictly when required hereunder, the Seller may, but shall not be obligated to, deliver to the Purchaser and to the Title Company a written notice of termination of this Agreement, which notice may be conclusively relied upon by the escrow agent in cancelling the Escrow and in complying with the provisions of this Section. If Purchaser timely delivers the Objection Letter, then all matters on the Survey except those contained in the Objection Letter shall then become Permitted Exceptions (defined in Section 3.8 (Permitted Exceptions)). If the Purchaser timely delivers the Objection Letter, then the Seller shall have the right, but not the obligation, to agree in writing to cure before the Closing such objections, or to decline to cure such objections.

       3.4.2     The Seller shall have until 5:00 p.m. Washington, D.C., time on the date which is seven (7) days after receipt of the Objection Letter (the "**Cure Date**") to agree in writing to cure before the Closing, or decline to cure, the Purchaser's objections to the Survey or the Title Commitment set forth in the Objection Letter in a manner acceptable to the Purchaser. If the Seller elects not to cure, or fails timely to respond to Objection Letter, the Seller shall be deemed to have elected not to cure, in which event, the Purchaser shall, on or before the expiration of the Due Diligence Period, either (a) terminate this Agreement by delivery of written notice to the Seller and the Title Company, whereupon the Title Company shall release and return the Deposit to the Purchaser, or (b) waive in writing its objections to the Survey and the Title Commitment set forth in the Objection Letter. The Purchaser's failure to timely deliver to the Seller and the Title Company a written notice that Purchaser elects to not to terminate this Agreement or to waive its objections set forth in the Objection Letter shall be deemed to constitute the Purchaser's election to terminate this Agreement. Upon the Purchaser's failure to deliver such notice to the Seller and the Title Company strictly when required hereunder, the Seller may, but shall not be obligated to, deliver to the Purchaser and to the Title Company a written notice of termination of this Agreement, which notice may be conclusively relied upon by the escrow agent in cancelling the Escrow and in complying with the provisions of this Section.

     3.5     Title Commitment.

       3.5.1     Within five (5) days after the Effective Date, the Seller, at the Purchaser's sole cost and expense, shall order from the Title Company, a Commitment for Title Insurance (the "**Title Commitment**"), setting forth the status of title to the Land and all exceptions which would appear in an Owner's Policy of Title Insurance, specifying the Purchaser as the named insured and showing the Purchase Price as the policy amount. The Purchaser shall, on or before 5:00 p.m. Washington, D.C., time on the date which is twenty (20) days after the Effective Date, deliver to the Seller, in writing any objections to matters shown in the Title Commitment (those matters to which objection is so made, the "**Disapproved Title**

Exceptions"). The Disapproved Title Exceptions shall be contained in the Objection Letter. Except as provided in Section 2.5.1 (Sale Free and Clear of Trusts' Liens; Application of Net Proceeds), failure by Purchaser to timely deliver an Objection Letter shall be deemed to constitute the Purchaser's unconditional and irrevocable disapproval of all exceptions contained in the Title Commitment and election to terminate this Agreement, whereupon the Purchaser's right and obligation to purchase the Property will automatically terminate (without any right on the part of the Purchaser to reinstate its right to purchase the Property hereunder), the Deposit will be delivered to the Purchaser, and neither party will have any further obligation or liability to the other party hereunder, except as otherwise expressly provided herein.   Upon the Purchaser's failure to deliver an Objection Letter strictly when required hereunder, the Seller may, but shall not be obligated to, deliver to the Purchaser and to the Title Company a written notice of termination of this Agreement, which notice may be conclusively relied upon by the escrow agent in cancelling the Escrow and in complying with the provisions of this Section. If Purchaser timely delivers the Objection Letter, then all matters on the Title Commitment except those contained in the Objection Letter, shall be deemed to constitute Purchaser's approval thereof and such  shall then become "**Permitted Exceptions**".  If the Purchaser timely delivers the Objection Letter, then the Seller shall have the right, but not the obligation, to attempt to cure or cause to be cured before the Closing such disapproved item(s). Seller shall have until 5:00 p.m. Washington, D.C., time on the Cure Date to agree in writing to cure before the Closing such disapproved item(s). If the Seller elects not to cure, or fails timely to respond to the Purchaser's objections in the Objection Letter, the Seller shall be deemed to have elected not to cure, in which event the Purchaser shall, on or before the expiration of the Due Diligence Period, either (a) terminate this Agreement by delivering to the Seller and the Title Company a written notice of termination, whereupon Title Company shall release and return the Deposit to the Purchaser, or (b) waive in writing its objection to the disapproved items, which shall then become Permitted Exceptions. The Purchaser's failure to timely deliver to the Seller and the Title Company a written notice of termination or waiver of its objection to the disapproved items shall be deemed to constitute the Purchaser's waiver of its objection to said items and such items shall become Permitted Exceptions.

3.5.2     The Purchaser shall have five (5) business days after receipt of any updates to the Title Commitment (including receipt of any documents referenced in such update) to object to any material matters disclosed therein which were not disclosed in the original Title Commitment or any prior such update, and the procedures for objecting to or approving of such matters shall be as set forth in Section 3.5.1.

3.6     Purchaser's Acceptance or Rejection Prior to Expiration of Due Diligence Period. On or before the expiration of the Due Diligence Period, if the Purchaser, after conducting the Inspections, as described in this Section 3 (Inspections and Approvals), desires to purchase the Property, the Purchaser must give the Seller and the Title Company written notice of its release of the inspection contingency under this Agreement (the "**Inspection Contingency Release**") . If prior to the expiration of the Due Diligence Period Purchaser delivers such notice of Inspection Contingency Release to the Seller and the Title Company, then the Purchaser will be deemed to have approved and accepted the Property and to have agreed to complete the transaction contemplated by this Agreement, and the Deposit will be nonrefundable, subject only to the provisions of Sections 9 (Damage, Destruction and Condemnation), 8.5 (Special Receiver

9

Provisions), 10.1 (Failure of Conditions Precedent), and 10.4 (Seller Default). The Purchaser's failure to deliver to the Seller and the Title Company a notice of Inspection Contingency Release on or before the expiration of the Due Diligence Period shall be deemed to constitute the Purchaser's unconditional and irrevocable disapproval of the condition of the Property, whereupon the Purchaser's right and obligation to purchase the Property will automatically terminate, subject to the immediate return of all copies of all Property Documents to the Seller, the Deposit will be delivered to the Purchaser, and neither party will have any further obligation or liability to the other party hereunder, except as otherwise expressly provided herein. Upon the Purchaser's failure to deliver such notice of Inspection Contingency Release to the Seller strictly when required hereunder, the Seller may, but shall not be obligated to, deliver to the Purchaser and to the Title Company a written notice of termination of this Agreement, which notice may be conclusively relied upon by the escrow agent in cancelling the Escrow and in complying with the provisions of this Section.

3.7    Contracts. Seller shall cause to be terminated as of the Closing Date all Contracts except for those Contracts Purchaser has notified Seller in writing prior to the expiration of the Due Diligence Period that Purchaser does not want terminated. Effective as of the Closing Date, the Purchaser will assume all of the Seller's liabilities and obligations with respect to the Contracts which are not terminated in accordance with the preceding sentence arising or accruing after the Closing Date. As used herein, the term **"Contracts"** means all service, maintenance, supply, or other contracts relating to the operation of the Property, and all other such assignable contracts or agreements in effect as of the Effective Date (but excluding any management, leasing, or brokerage agreements, and any contracts that are the subject of or are entered into in connection with or pursuant to the Shopping Center Reciprocal Easement and Operation Agreement, as amended, that is the subject of the Assignment of REA [as hereinafter defined]), including those which are listed on Schedule 3.7 attached hereto.

3.7.1    Consents to Transfer. The Purchaser shall be responsible for securing any consent from third parties who have the right to consent to the transfer of any Contract, Permit, Intangible Property, or Lease and paying any fee in connection with such consent or early termination of same. The consents shall provide that if the transaction contemplated by this Agreement is not consummated, the consent will not be effective. It is understood that a failure to obtain such consents is not a condition precedent to the Purchaser's obligation to close. The Purchaser will take subject to all liability which arises as a result of failing to obtain any such consent and shall indemnify, defend, and hold harmless the Seller from any liability, claims, actions, expenses, or damages incurred by the Seller as a result of such failure, should the Seller elect to waive the issuance of such consents as a precondition to the Closing under Section 8 (Closing and Escrow). Such indemnity shall survive the Closing.

3.8    Permitted Exceptions. The Purchaser shall accept title to the Property, subject to the following exceptions (the **"Permitted Exceptions"**):

3.8.1    Those matters affecting or relating to the title to, or the survey of, the Property (a) which are of record on the date of the Title Commitment or as shown on the Survey, and which were not included in an Objection Letter timely delivered by the Purchaser or Free and Clear Liens; (b) which were included in an Objection Letter, but for which (i) the Seller has completed the cure thereof; or (ii) the Purchaser has waived or been deemed to have waived the

10

cure thereof or (iii) the Seller has elected to cure and will be cured by the payment of money at Closing; or (c) which the Purchaser has otherwise approved in writing.

        3.8.2    The lien of non-delinquent taxes, assessments and other usual and customary charges assessed against the owners of real property in California.

        3.8.3    All matters disclosed by the Property Documents, Leases, Contracts, and Intangible Property not prohibited hereunder.

        3.8.4    All building and zoning laws, codes, and regulations affecting the Property, including all proffers, special exceptions, conditions, site plan approvals, and other similar matters, if any, relating to the zoning of the Real Property.

        3.8.5    All standard pre-printed exceptions set forth in the standard owners' policy of title insurance issued by the Title Company to the Purchaser for the Property.

    3.9    <u>Natural Hazards Disclosure</u>. The Purchaser hereby acknowledges that the transfer of the Property to it by the Seller will be pursuant to an order of the Court. Accordingly, the Purchaser acknowledges and agrees that, pursuant to Section 1103.1 of the California Civil Code, the Seller is exempt from the requirement to provide a Natural Hazard Disclosure Statement to the Purchaser under Section 1103.2 of the California Civil Code.

4.    **SELLER'S OBLIGATIONS PRIOR TO CLOSING**. Until the Closing, the Seller, directly or through the Seller's agents or representatives, shall:

    4.1    <u>Insurance</u>. Keep the Property insured, in an amount sufficient to satisfy any co-insurance requirement or stipulation, against fire and other hazards covered by extended coverage endorsement and commercial general liability insurance against claims for bodily injury, death and property damage occurring in, on or about the Property.

    4.2    <u>Operation</u>. Maintain the Property in substantially the same physical condition as it exists as of the last day of the Due Diligence Period and make repairs or replacements in the ordinary course of business in connection with any damage to the Property, and deliver the Property to the Purchaser at the Closing in the condition existing as of the last day of the Due Diligence Period, normal wear and tear and damage by casualty and condemnation excepted.

    4.3    <u>Notices</u>. Provide to the Purchaser upon the receipt thereof, any and all written notices relating to the Property received by the Seller or his agents or representatives from any governmental or quasi-governmental instrumentality, insurance company, vendor, or other party under any of the Contracts, or from any other entity or party, which notices are of a type not normally received in the ordinary course of the owner of property such as the Property, or which may have a material effect upon the Property or result in a material change in a representation or warranty made by the Seller hereunder.

    4.4    <u>Compliance with Agreements</u>. Except to the extent otherwise permitted by the Receiver Order, comply in all material respects with all agreements, covenants, encumbrances, and obligations affecting or relating to the Property and the ownership, operation, and

11

maintenance thereof. The Seller shall, to the extent of available cash in the Receivership, after giving due consideration for the other outstanding administrative expenses of the Receivership and the establishment of adequate reserves, pay all utility bills, tax bills, and other invoices and expenses relating to the Property, as and when the same become payable.

4.5     New Contracts. Prior to the expiration of the Due Diligence Period, the Seller may, without the prior consent of the Purchaser, enter into any Contracts provided that the Seller shall provide the Purchaser written notice of such actions. After the expiration of the Due Diligence Period, the Seller agrees that, except in the case of an emergency, it will not take any actions set forth in the preceding sentence without the Purchaser's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed.

4.6     Leases. The Purchaser shall, at the Closing, assume all the obligations of the Seller under any and all leases, tenancies, licenses, and other rights of occupancy or use of or for any portion of the Real Property (including all amendments, renewals, and extensions thereof) (collectively, the "**Leases**") in effect on the Closing Date, including the Leases set forth on Schedule 4.6 attached hereto. Prior to the expiration of the Due Diligence Period, the Seller may (a) amend or terminate any Leases; (b) consent to the assignment of any Leases or subleasing of any of the Property; or (c) enter into any new Lease of the Property or any portion thereof, provided that the Seller provides the Purchaser with written notice of such actions. After the expiration of the Due Diligence Period, the Seller agrees that it will not take any actions set forth in (a) through (c) above without the Purchaser's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed.

5.     **REPRESENTATIONS AND WARRANTIES.**

5.1     By Seller. The Seller represents and warrants to the Purchaser, as of the Effective Date, that:

5.1.1     The facts set forth in Recital Paragraph B are true and correct.

5.1.2     Subject to the Receiver Order and entry of the Sale Confirmation Order and to the commencement of any case under the Bankruptcy Code (Title 11 of the United States Code) by or against the Owner, the Seller has the power, right, and authority to enter into and perform all of the obligations required of the Seller under this Agreement and the instruments and documents referenced herein, and to consummate the transaction contemplated hereby.

5.1.3     The Seller has taken all requisite action and obtained, or will seek to obtain prior to the Closing, all requisite consents, releases, and permissions in connection with entering into this Agreement and the instruments and documents referenced herein or required under any covenant, agreement, encumbrance, law, or regulation with respect to the obligations required hereunder.

5.1.4     This Agreement is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Agreement shall be, duly authorized, executed, and delivered by the Seller. This Agreement is, and all agreements, instruments and documents

12

to be executed and delivered by Seller pursuant to this Agreement shall be, valid and legally binding upon Seller and enforceable in accordance with their respective terms.

5.1.5    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument, or other obligation to which the Seller is a party or by which the Seller may be bound.

5.1.6    Seller has provided or will provide to Purchaser copies of all Contracts in Seller's possession, and the Contracts identified in Schedule 3.7 are the only Contracts of which Seller is aware (whether or not they are in Seller's possession).

The representations and warranties set forth in this Section 5 (Representations and Warranties) shall not survive the Closing, and no action or claim may be brought against the Seller by the Purchaser or any affiliate of the Purchaser with respect to a breach of such representations or warranties or any action, suit, or other proceedings commenced or pursued, for or in respect of any breach of any representation or warranty made by the Seller in this Agreement from and after the Closing.

5.2    By Purchaser. The Purchaser represents and warrants to the Seller, as of the Effective Date, that:

5.2.1    The Purchaser is a corporation, partnership, limited liability company, trust, or other type of business organization that is duly organized, validly existing, and in good standing under the laws of the state in which it was organized, and the Purchaser is qualified to do business in the jurisdiction in which the Property is located.

5.2.2    The Purchaser has taken all requisite action and obtained all requisite consents, releases, and permissions in connection with entering into this Agreement and the instruments and documents referenced herein or required under any covenant, agreement, encumbrance, law, or regulation with respect to the obligations required hereunder, and no consent of any other party is required for the performance by Purchaser of its obligations hereunder.

5.2.3    This Agreement is, and all agreements, instruments, and documents to be executed and delivered by the Purchaser pursuant to this Agreement shall be, duly authorized, executed and delivered by the Purchaser. This Agreement is, and all agreements, instruments, and documents to be executed and delivered by the Purchaser pursuant to this Agreement shall be, valid and legally binding upon the Purchaser and enforceable in accordance with their respective terms.

5.2.4    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument, or other obligation to which the Purchaser is a party or by which the Purchaser may be bound, or any law, statute, ordinance, rule, governmental regulation, or any writ, injunction, order, or decree of any court or governmental body, applicable to the Purchaser or to the Property.

5.2.5    No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against or, to the best of the Purchaser's knowledge, contemplated by the Purchaser.

5.2.6    There are no actions, suits, claims or other proceedings (collectively, "**Litigation**") pending or, to the best of the Purchaser's knowledge, contemplated or threatened against the Purchaser that could affect the Purchaser's ability to perform its obligations when and as required under the terms of this Agreement.

5.3    Broker. The Seller and the Purchaser each represents to the other that it has had no dealings, negotiations, or consultations with any broker, representative, employee, agent, or other intermediary in connection with the sale of the Property, except that the Seller has retained the services of Faris Lee Investments (the "**Seller's Broker**").  The Seller shall be solely responsible for paying the fees and commissions owed to the Seller's Broker pursuant to a separate written agreement between the Seller and the Seller's Broker. No fees or commissions owed or alleged to be owed to the Seller's Broker shall in any way be the responsibility of the Purchaser, and the sole responsibility of the Seller shall be to pay the Seller's Broker in accordance with such separate written agreement. The Seller and the Purchaser agree that each will indemnify, defend, and hold the other free and harmless from the claims of any broker other than the Seller's Broker, representative, employee, agent, or other intermediary claiming to have represented the Seller or the Purchaser, respectively, or otherwise to be entitled to compensation in connection with this Agreement or in connection with the sale of the Property. This mutual indemnity shall survive the Closing and any termination of this Agreement.

5.4    Property Condition.

5.4.1    Disclaimer. THE PURCHASER ACKNOWLEDGES AND AGREES THAT THE SELLER HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN AS SET FORTH IN THIS AGREEMENT), PROMISES, COVENANTS, AGREEMENTS, OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE, OF, AS TO, CONCERNING, OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY, OR CONDITION OF THE PROPERTY, INCLUDING THE WATER, SOIL, AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH THE PURCHASER MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES, OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR, OR LACK OF REPAIR OF THE PROPERTY, OR (H) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY, AND SPECIFICALLY, THAT THE SELLER HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS REGARDING COMPLIANCE

14

WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION, OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS OR SUBSTANCES. THE PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, THE PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY THE SELLER, AND ACCEPTS THE PROPERTY AND WAIVES ALL OBJECTIONS OR CLAIMS AGAINST THE SELLER (INCLUDING ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. THE PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT THE SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. THE PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT (A) THE SELLER IS ONLY THE RECEIVER WITH RESPECT TO THE PROPERTY AND, THUS, HAS LITTLE LONG-TERM KNOWLEDGE WITH RESPECT TO THE PROPERTY; (B) ALL DOCUMENTS RELEVANT TO THE PROPERTY MAY NOT BE IN THE SELLER'S ACTUAL, PHYSICAL POSSESSION AND THEREFORE MAY NOT BE INCLUDED IN THE PROPERTY DOCUMENTS, AND (C) THE PROPERTY DOCUMENTS MAY HAVE BEEN PREPARED BY PERSONS OTHER THAN THE SELLER. THE SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS OTHER THAN AS SET FORTH IN THIS AGREEMENT, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT, OR OTHER PERSON. THE PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "**AS IS**" CONDITION AND BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE FOR THE PROPERTY HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY THE SELLER AND PURCHASED BY THE PURCHASER SUBJECT TO THE FOREGOING.

     5.4.2   <u>Release of Claims</u>. Without limiting the provisions of Section 5.4.1, the Purchaser releases the Seller, the Trusts, and CW Capital from any and all Claims (whether known or unknown, and whether contingent or liquidated) arising from or related to (a) any defects, errors, or omissions in the design or construction of the Property, whether the same are a result of negligence or otherwise; or (b) other conditions (including environmental conditions) affecting the Property, whether the same are a result of negligence or otherwise. The release set forth in this Section 5 (Representations and Warranties) specifically includes any Claims under any Environmental Laws (defined in the next sentence), under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.*, or with respect to any environmental risk. "**Environmental Laws**" include the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. §6901, *et seq.*), the Comprehensive Environmental

Response, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601, et seq.), the Emergency Planning and Community Right to Know Act (42 U.S.C. §§11001, et seq.), the Clean Air Act (42 U.S.C. §§7401, et seq.), the Clean Water Act (33 U.S.C. §§1251, et seq.), the Toxic Substances Control Act (15 U.S.C. §§2601, et seq.), the Hazardous Materials Transportation Act ( 49 U.S.C. §§1801, et seq.), the Occupational Safety and Health Act (29 U.S.C. §§651, et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §§136, et seq.), and the Safe Drinking Water Act (42 U.S.C. §§300f, et seq.), as any of the same may be amended from time to time, and any state or local law dealing with environmental matters, and any regulations, orders, rules, procedures, guidelines, or the like promulgated in connection therewith, regardless of whether the same are in existence on the date of this Agreement.

   5.4.3 <u>Acknowledgment of Inspection</u>. The Purchaser acknowledges and agrees that (a) this Agreement gives the Purchaser the opportunity to inspect the Property and its operation, (b) if this transaction is consummated, the Purchaser will be purchasing the Property pursuant to the Purchaser's independent examination, study, inspection, and knowledge of the Property, and (c) The Purchaser is relying upon its own determination of the value and condition of the Property and not on any information provided or to be provided by the Seller. The Purchaser is relying solely upon its own inspections, investigations, research, and analyses in entering into this Agreement and is not relying in any way upon any representations or warranties (except those expressly provided in Section 5 (Representations and Warranties)), statements, plans, specifications, cost estimates, studies, reports, descriptions, guidelines, or other information or material furnished by the Seller or his agents or representatives to the Purchaser or its agents or representatives, whether oral or written, express or implied, of any nature whatsoever regarding any such matters. With respect to any Personal Property being conveyed hereunder, the Purchaser shall not rely on any list of such property compiled by the Seller or his agents or representatives.

   5.4.4 <u>RELEASE</u>. THE PURCHASER HEREBY RELEASES THE SELLER, THE INDEMNIFIED PARTIES, AND ANY SERVICER, AGENT, REPRESENTATIVE, MANAGER, AFFILIATE, OFFICER, PARTNER, SHAREHOLDER, OR EMPLOYEE OF THE SELLER OR AN INDEMNIFIED PARTY (A **"SELLER RELATED PARTY"**) FROM ALL CLAIMS, LOSSES, DAMAGES, LIABILITIES, COSTS, AND EXPENSES WHICH THE PURCHASER OR ANY PARTY RELATED TO OR AFFILIATED WITH THE PURCHASER (A **"PURCHASER RELATED PARTY"**) HAS OR MAY HAVE ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED TO THE PHYSICAL CONDITION OF THE PROPERTY, ANY CONSTRUCTION DEFECTS, ANY ERRORS OR OMISSIONS IN THE DESIGN OR CONSTRUCTION OF THE PROPERTY, OR ANY ENVIRONMENTAL CONDITIONS AT, IN, ON, OR UNDER THE PROPERTY, AND NEITHER THE PURCHASER NOR ANY PURCHASER RELATED PARTY WILL LOOK TO THE SELLER OR ANY SELLER RELATED PARTY IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF. TO THE EXTENT OF ANY WAIVERS AND RELEASES BY THE PURCHASER CONTAINED IN THIS AGREEMENT INCLUDING AS SET FORTH IN SECTION 3.3.1, SECTION 5.4.2 AND THIS SECTION 5.4.4, THE PURCHASER EXPRESSLY WAIVES THE BENEFITS OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE (**"SECTION 1542"**) AND ANY SIMILAR LAW OF ANY

OTHER STATE, TERRITORY, OR JURISDICTION. SECTION 1542 READS AS FOLLOWS:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

The Purchaser hereby specifically acknowledges that the Purchaser has carefully reviewed this section and discussed its import with legal counsel and that the provisions of this section are a material part of this Agreement.

_____
Purchaser's Initials

5.4.5   CONTRACTS. EFFECTIVE AS OF THE CLOSING DATE, THE PURCHASER WILL TAKE SUBJECT TO (AND TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT OR IN THE CLOSING DOCUMENTS, WILL ASSUME) ALL OF THE SELLER'S OBLIGATIONS WITH RESPECT TO THE CONTRACTS, LEASES, AND PERMITS (TO THE EXTENT SUCH PERMITS ARE ASSIGNED OR TRANSFERRED) ARISING OR ACCRUING FROM AND AFTER THE CLOSING DATE.

5.4.6   SURVIVAL. THE ACKNOWLEDGEMENTS AND AGREEMENTS OF THE PURCHASER SET FORTH IN THIS SECTION 5 (REPRESENTATIONS AND WARRANTIES) WILL SURVIVE THE CLOSING.

5.4.7   PERSONAL PROPERTY; INTANGIBLE PROPERTY. THE SELLER MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, AS TO THE OWNER'S TITLE TO THE PERSONAL PROPERTY OR THE INTANGIBLE PROPERTY.

6.      **CONDITIONS PRECEDENT TO CLOSING.**

6.1     Conditions for Benefit of Purchaser. The obligation of the Purchaser to consummate the conveyance of the Property hereunder is subject to the full and complete satisfaction or waiver of each of the following conditions precedent:

6.1.1   The representations and warranties of the Seller contained in this Agreement shall be true, complete, and accurate in all material respects, on and as of the date hereof and the Date of Closing as if the same were made on and as of such date.

6.1.2   The Seller shall have performed each and every material obligation and covenant of the Seller to be performed hereunder unless performance thereof is waived by the Purchaser (provided that this condition to the obligation of the Purchaser to consummate the

17

conveyance of the Property hereunder shall not limit the Purchaser's remedies under Section 10.4 (Seller Default) of this Agreement for a default by the Seller as set forth in Section 10.4 (Seller Default)).

      6.1.3    The Property is in substantially the same physical condition as it existed as of the last day of the Due Diligence Period, normal wear and tear and damage by casualty and condemnation excepted; any change in condition due to casualty or condemnation shall be controlled by the provisions of Section 9 (Damage, Destruction and Condemnation).

      6.1.4    The Sale Confirmation Order has been entered in the Action.

    6.2    <u>Waiver of Conditions</u>. The Purchaser shall have the right to waive some or all of the foregoing conditions except Section 6.1.4 in its sole and absolute discretion; provided, however, that no such waiver shall be effective or binding on the Purchaser unless it is in writing and executed by an authorized officer of Purchaser.

    6.3    <u>Conditions for Benefit of Seller</u>. The obligation of the Seller to consummate the conveyance of the Property hereunder is subject to the full and complete satisfaction or waiver of each of the following conditions precedent:

      6.3.1    The Sale Confirmation Order has been entered in the Action.

      6.3.2    Receipt by Purchaser of any and all required consents to the transfer of any Contract, permit, or Lease to be assigned to the Purchaser at Closing.

      6.3.3    The Purchaser shall have performed each and every material obligation and covenant of the Purchaser to be performed hereunder unless performance thereof is waived by the Seller (provided that this condition to the obligation of the Seller to consummate the conveyance of the Property hereunder shall not limit the Seller's remedies under Section 10.2 (Purchaser Default) and Section 10.3 (Liquidated Damages) of this Agreement for a default by the Purchaser as set forth in Section 10.2 (Purchaser Default)).

    6.4    <u>Waiver of Conditions</u>. Seller shall have the right to waive some or all of the foregoing conditions except Section 6.3.1 in its sole and absolute discretion; provided, however, that no such waiver shall be effective or binding on the Seller unless it is in writing and executed by the Seller.

    6.5    <u>Failure of a Condition</u>. In the event any of the conditions set forth in this Section 6 (Conditions Precedent to Closing) are not fulfilled or waived, the parties shall proceed in accordance with Section 10.1 (Failure of Conditions Precedent) hereof.

## 7.    CLOSING COSTS AND PRORATIONS.

    7.1    <u>Purchaser's Costs</u>. The Purchaser will pay the following costs of closing this transaction:

      7.1.1    All recording fees and any and all state and county recordation, documentary, or transfer taxes;

18

7.1.2    All premiums, fees, and costs associated with the issuance of any title policy (except endorsements obtained by the Seller to cure Title Objections or the Survey Objections as referred to in Section 3 (Inspections and Approvals)) as well as for all premiums, fees, and costs associated with the issuance of a mortgagee title insurance policy, and one-half (1/2) of the settlement fees and other charges of the Title Company due in connection with the closing of this transaction;

7.1.3    The cost of the Survey (but not the Existing Survey);

7.1.4    The fees and disbursements of the Purchaser's counsel and any other expense(s) incurred by the Purchaser or its agents or representatives in inspecting or evaluating the Property or closing this transaction;

7.1.5    Any and all costs and expenses in connection with obtaining financing for the purchase of the Property, including without limitation any recordation or transfer taxes required to be paid upon the recordation of any deed of trust, mortgage, or other security agreement executed and recorded in connection with such financing; and

7.1.6    Any sales taxes payable with respect to any personal property included within the Property.

7.2    <u>Seller's Costs</u>. The Seller will pay the following costs of closing this transaction:

7.2.1    One-half (1/2) of the settlement fees and charges of the Title Company due in connection with the closing of this transaction (these fees and charges and those fees and charges identified in Section 7.2.4, collectively, the "**Seller's Closing Costs**");

7.2.2    The fees and disbursements of the Seller's counsel;

7.2.3    The fees of the Seller's Broker referred to in Section 5.3 (Broker), above; and

7.2.4    All release fees and other charges required to be paid in order to release from the Property the lien of any mortgage or other security interest which the Seller is obligated to remove pursuant to the terms of this Agreement.

7.3    <u>Prorations</u>. All revenues and expenses, including, but not limited to rents and any other amounts paid by tenants, personal property taxes, installment payments of special assessment liens, vault charges, sewer charges, utility charges, reimbursement of maintenance and repair expenses, and normally prorated operating expenses billed or paid as of the Date of Closing shall be prorated as of 11:59 p.m., Washington, D.C., time, on the day before the Date of Closing and shall be adjusted against the Purchase Price due at the Closing. No post-closing re-prorations shall occur.

7.3.1    The Seller and the Purchaser shall in good faith attempt to have all Contracts that affect the Property and for which the charges are based upon usage (including utilities) billed or read as of a time as close to the Closing as is reasonable, provided that the Seller shall not be liable for any charges which accrued or became payable prior to the date of

19

entry of the Receivership Order (it being understood that neither shall Purchaser). If a precise billing or reading as of the Closing is not available at the Closing with respect to any such Contract, then the foregoing adjustment shall be made, by payment or credit at the Closing, by pro-rating to the Closing from the latest billing or reading then available. No post-Closing re-prorations shall occur.

        7.3.2    The Seller shall close out any accounts with utility companies and shall have the right to receive any and all deposits held on behalf of the Seller or the Owner by utility companies with respect to the Property.

        7.3.3    Attached hereto as Schedule 7.3.3 is a list of refundable deposits paid by tenants and contractors and held by the Seller (collectively, "**Tenants' Deposits**") as of the Effective Date. The Seller shall quitclaim to the Purchaser at the Closing the Tenants' Deposits as provided in Section 8.1.2, which shall be transferred to the Purchaser at Closing by wire or check at the Purchaser's option, and the Purchaser shall assume liability for all such Tenants' Deposits.

        7.3.4    The Seller shall be liable for any and all brokerage or leasing commissions and similar compensation due any party prior to the Closing Date in connection with a commission agreement executed by the Seller for the Leases assumed by the Purchaser at the Closing, and the Purchaser shall be responsible for all other such commissions, including (a) such commissions and other compensation as may be due in connection with the exercise, after the Closing, of any extension, renewal, expansion, or purchase rights or options contained in those Leases or entered into in connection with those Leases; and (b) such commissions and other compensation as may be due in connection with any amendments or new Leases entered into after the Closing.

        7.4    Taxes. General real estate taxes and special assessments relating to the Property payable during the real estate tax year in which Closing occurs (collectively, the "**Taxes**") shall be prorated with respect to the Property as of the Date of Closing, with the Seller being responsible for Taxes attributable to the Seller's period of possession of the Property and the Purchaser being responsible for Taxes attributable to the period from and after the Date of Closing. If the Closing shall occur before the Taxes are known, the apportionment of Taxes shall be upon the basis of taxes for the Property payable during the immediately preceding year. If, as the result of an appeal of the assessed valuation of the Property for any real estate tax year prior to (or including) the Closing, there is issued after the Closing an administrative ruling, judicial decision, or settlement by which the assessed value of the Property for such tax year is reduced, and a real estate tax refund issued, the Seller shall be entitled to all such refunds relating to the period prior to Closing and the Purchaser shall be entitled to all such refunds relating to the period from and after the Closing Date. No post-closing re-prorations shall occur.

        The Seller reserves the right to appeal the assessed valuation of the Property for any real estate tax year prior to (or including) the Closing Date.  Purchaser hereby waives, releases, disclaims and relinquishes any right the Purchaser may have or hereafter acquire to receive and retain any real property tax refunds resulting from any and all property tax appeals pending as of the Closing.

7.5     In General. Any other costs or charges of closing this transaction not specifically mentioned in this Agreement shall be paid and adjusted in accordance with local custom or ordinance in Orange County, California.

7.6     Purpose and Intent. Except as expressly provided herein, the purpose and intent as to the provisions of prorations and apportionments set forth in this Section 7 (Closing Costs and Prorations) and elsewhere in this Agreement is that the Seller shall bear all expenses of ownership and operation of the Property during its period of ownership and shall receive all income therefrom accruing through midnight of the day preceding the Closing, and the Purchaser shall bear all such expenses and receive all such income accruing thereafter.

8.     **CLOSING AND ESCROW.**

8.1     Seller's Deliveries. The Seller shall deliver either at the Closing or by making available at the Property, as appropriate, the following original documents, each executed and, if required, acknowledged:

8.1.1     A grant deed, in the form attached hereto as Schedule 8.1.1 (the "**Deed**"), conveying title to the Purchaser of the Real Property, subject only to the Permitted Exceptions.

8.1.2     Originals (to the extent in the Seller's possession) of the Leases and the Contracts; and (b) an assignment of the Leases and Contracts, including the Tenants' Deposits, to Purchaser by way of an assignment and assumption agreement, in the form attached hereto as Schedule 8.1.2 (the "**Assignment and Assumption Agreement**"), conveying to the Purchaser the Seller's and Owner's rights, title, and interests, if any, in and to the Leases and Contracts attributable to the Property.

8.1.3     Originals (to the extent in Seller's possession) of all warranties then in effect, if any, with respect to the Property or any repairs or renovations to the Property; and (b) an assignment of all such warranties and guarantees being conveyed hereunder, conveying to the Purchaser the Seller's and the Owner's rights, title, and interests, if any, in and to the warranties attributable to the Property.

8.1.4     An affidavit pursuant to the Foreign Investment and Real Property Tax Act.

8.1.5     Appropriate evidence of authority, capacity, and status of the Seller as reasonably required by the Title Company.

8.1.6     An "owner's affidavit", in form reasonably acceptable to the Seller and the Title Company and sufficient for the Title Company to delete any exceptions for (a) mechanics' or materialmen's liens arising from work at the Property which is the responsibility of the Seller hereunder, (b) parties in possession, other than tenants as tenants only, and, (c) matters not shown in the public records.

21

8.1.7    A settlement statement (the "**Settlement Statement**"), prepared by the Title Company.

8.1.8    A quit claim bill of sale in the form attached hereto as Schedule 8.1.8 (the "**Bill of Sale**") transferring to the Purchaser all of the Seller's and the Owner's rights, title, and interests, if any, in the Personal Property.

8.1.9    An Assignment and Assumption of Reciprocal Easement Agreement (the "**Assignment of REA**") in the form attached hereto as Schedule 8.1.9.

8.1.10    To the extent such certificates are in the possession and control of Seller, one (1) copy of a Tenant Estoppel Certificate executed by the Tenant under each Tenant Lease in the form of Schedule 8.1.10 (the "**Tenant Estoppel Certificate**").

8.1.11    Such other documents, certificates, and other instruments as may be reasonably required to consummate the transaction contemplated hereby.

8.2    <u>Purchaser's Deliveries</u>. At the Closing, the Purchaser shall (a) pay the Seller the Purchase Price as required by, and in the manner described in, Section 2 (Purchase Price and Payment) hereof, and (b) execute and deliver the following documents:

8.2.1    The Assignment and Assumption Agreement.

8.2.2    The Bill of Sale.

8.2.3    The Assignment of REA.

8.2.4    Evidence of Purchaser's authority, and the authority of the person executing any documents at the Closing on behalf of the Purchaser, acceptable to the Seller and the Title Company, to enter into the transactions contemplated by this Agreement.

8.2.5    The Settlement Statement.

8.2.6    Such other documents, certificates, and other instruments as may be reasonably required to consummate the transaction contemplated hereby.

8.3    <u>Possession</u>. The Purchaser shall be entitled to possession of the Property at the conclusion of the Closing.

8.4    <u>Escrow Closing</u>. The Purchaser and the Seller (or their respective counsel on behalf of Purchaser and Seller) shall execute letters of escrow closing instructions (the "**Closing Instructions**") which will provide that, on the Date of Closing: (a) the Seller and the Purchaser shall each deposit with the Title Company all of the documents and instruments described in Sections 8.1 ("**Seller's Deliveries**") and 8.2 ("**Purchaser's Deliveries**") (collectively, the "**Closing Documents**"); and (b) the Purchaser shall deposit with the Title Company the balance of the Purchase Price required to be paid after application of the Deposit thereto and all prorations, adjustments, and credits required to be made under this Agreement (the "**Adjusted Purchase Price**"), all of which shall be set forth on, and mutually agreeable pursuant to, a

22

Settlement Statement executed by both the Purchaser and the Seller at Closing. Upon receipt of the Adjusted Purchase Price, and the satisfaction of all other conditions set forth in the Closing Instructions, the Title Company shall be authorized and directed to disburse the Adjusted Purchase Price to Seller or its designee(s), record the Deed and the Assignment of REA among the land records of Orange County, California, and release the remaining Closing Documents to the appropriate parties, all in strict accordance with the Closing Instructions.

    8.5    Special Receiver Provisions.

        8.5.1    Confirmation Motion. As soon as practicable after the Effective Date, but not later, in the case of the following clause (a), twenty (20) business days after the Effective Date, the Seller shall either (a) enter into a stipulation (the "**Stipulation**") with the Owner and the Trusts for approval and confirmation of the sale of the Property to the Purchaser pursuant to this Agreement and waiving all rights of appeal, and file the Stipulation in the Action; or (b) make a motion in the Action seeking approval and confirmation of the sale of the Property to the Purchaser pursuant to this Agreement (the "**Sale Confirmation Motion**"), seek a hearing thereon as soon as is practicable in light of the notice provisions of the Receiver Order, and in the case of either clause (a) or (b) above, take all other actions in connection herewith required thereby.

        8.5.2    Non-Approval of Sale Confirmation Motion. If pursuant either to the Stipulation or the Sale Confirmation Motion, the District Court does not approve and confirm the sale of the Property to the Purchaser pursuant to this Agreement by entering the Sale Confirmation Order in the Action (a) to that effect; (b) that provides that the sale of the Property to the Purchaser may close free and clear of the Free and Clear Liens; and (c) that becomes final and non-appealable, this Agreement will automatically be terminated without the need for notice by either party; provided, however, that (x) a continuance of that hearing, (y) the lack of a dispositive ruling by the Court on the Sale Confirmation Motion at or following that hearing, or (z) the taking of an appeal by any person with respect to a ruling by the Court on the Sale Confirmation Motion will not, in and of themselves, constitute non-approval and non-confirmation by the Court of the sale of the Property to the Purchaser pursuant to this Agreement.

        8.5.3    Owner Bankruptcy. If the Owner or any transferee of the Property or any interest therein (any such transferee being deemed to be the Owner for purposes of this Section 8.5.3) becomes a debtor under the Bankruptcy Code and the Purchaser does not elect to terminate this Agreement pursuant to one of the next two sentences, the Seller shall, as soon as is practicable thereafter, but only to the extent that he has the resources and the consent of the Trusts to do so, seek in the United States Bankruptcy Court in which the case of the Owner is pending (that court, the "**Bankruptcy Court**"; and that case, the "**Case**"), to be excused from compliance with Bankruptcy Code sections 543(a) and (b)(1). If any Owner becomes such a debtor, (a) the Seller shall, promptly on becoming aware thereof, give notice to the Purchaser and the Title Company thereof; (b) the Purchaser must, within five business days of its receipt of that notice, elect, by giving notice of that election to the Seller and the Title Company , either (i) to have the Seller proceed under the preceding sentence; or (ii) to terminate this Agreement; provided, however, that if the Purchaser does not so elect to terminate this Agreement, it will be conclusively deemed to have elected to have the Seller proceed under foregoing clause (b)(i). If,

23

notwithstanding the Purchaser's election to have the Seller proceed under foregoing clause (b)(i), the Seller does not have the resources to do so, fails promptly to obtain the consent of the Trusts to do so, or fails promptly to advise the Purchaser on the Purchaser's request that the Seller does have those resources and that consent, the Purchaser may terminate this Agreement by giving notice of that termination to the Seller and the Title Company. If this Agreement has not been terminated as set forth above and, within the extended time permitted for the Closing to occur pursuant to Section 8.5.5 (Extension of Closing Date), that compliance has not been excused and the automatic stay provided by Bankruptcy Code section 362(a) (the "**Automatic Stay**") has not been terminated, annulled, modified, or conditioned with respect to the Property so as to permit the Closing to occur with that time, this Agreement will automatically be terminated without the need for notice by either party.

      8.5.4    <u>Termination of Agreement</u>. If this Agreement is terminated pursuant to Sections 8.5.2 (Non-Approval of Sale Confirmation Motion) or 8.5.3 (Owner Bankruptcy), the Deposit (including any interest earned thereon while the same was held in the Escrow) is to be refunded to the Purchaser without deduction of any escrow costs, all of which are to be borne by the Seller, provided that the Seller is still in possession of the Property and no Owner has become a debtor under the Bankruptcy Code, as provided in Section 3.6 (Purchaser's Acceptance or Rejection Prior to Expiration of Due Diligence Period). For the avoidance of doubt, the foregoing provision shall not be construed to prohibit the Purchaser from seeking, at Purchaser's sole expense, the recovery or turnover of the Deposit or any portion thereof and the payment of escrow costs by appropriate proceedings in the Action or in any Case before the Bankruptcy Court.

      8.5.5    <u>Extension of Closing Date</u>.

          (a)    The inability the Seller to sell the Property to the Purchaser pursuant hereto due to the lack of a Sale Confirmation Order, the Seller's compliance with Bankruptcy Code sections 543(a) or (b)(1), or the continuation of the Automatic Stay with respect to the Property will not be a breach of this Agreement by the Seller. If, (a) notwithstanding compliance by the Seller with Section 8.5.1 (Sale Confirmation Motion), and provided that the Court has not denied the Sale Confirmation Motion by a final, non-appealable order in the Action, the Sale Confirmation Order has not been obtained by the Seller by the Closing Date; or (b) notwithstanding compliance by the Seller with Section 8.5.3 (Owner Bankruptcy), and provided that the Bankruptcy Court has not denied by final, non-appealable orders in the Case the Seller's motion to be excused from compliance with Bankruptcy Code sections 543(a) and (b)(1) and any motion of the Trustee to terminate, annul, modify, or condition the Automatic Stay with respect to the Property so as to permit the Closing to occur, the Seller may, in its discretion, by notice to the Purchaser and the Title Company , from time to time extend the Closing Date to a later business day designated in that notice (which business day will thereupon become the new Closing Date) to allow additional time within which to obtain, as the case may be, the Sale Confirmation Order or orders of the Bankruptcy Court excusing the Seller's compliance with Bankruptcy Code sections 543(a) and (b)(1) and any motion of the Trusts to terminate, annul, modify, or condition the Automatic Stay with respect to the Property so as to permit the Closing to occur, but in no event, without the mutual agreement

of the Seller and the Purchaser, may the Closing Date be extended to a date that is more than 90 days from the original Closing Date set out in Section 2.4 (Closing).

(b)    If (a)(i) any update to the Title Commitment is delivered to the Purchaser; and (ii) the time for either the Purchaser or the Seller to make any objection or election with respect thereto pursuant to Section 3.5.1 will not expire on or before two business days before the then-Closing Date; (b)(i) there is loss or damage to the Property; and (ii) either (1) the time within which the Seller must give the Purchaser the Seller's estimate of the cost to repair the same pursuant to Section 9.1 (Casualty); or (2) the time for the Purchaser to make its election pursuant to that section will not expire on or before two business days before the then-Closing Date; or (c)(i) there is a condemnation or eminent domain proceeding that affects the Property; and (ii) the time for the Purchaser to make its election pursuant to Section 9.2 (Condemnation) below will not expire on or before two business days before the then-Closing Date, then the Closing Date will be extended to the first business day that is two business days after the last day for making that election or giving that estimate, as the case may be (which business day will thereupon become the new Closing Date).

9.      **DAMAGE, DESTRUCTION AND CONDEMNATION.**

9.1    Casualty. Except as provided herein, the Seller assumes all risk of loss or damage to the Property by fire or other casualty until the Closing. If at any time on or prior to the Date of Closing any portion of the Property is destroyed or damaged as a result of fire or any other cause whatsoever, the Seller shall promptly give written notice thereof to the Purchaser and the Title Company. If the estimated cost to repair the damage or destruction exceeds $250,000 as reasonably estimated by the Seller, the Purchaser shall have the right to terminate this Agreement by written notice to the Seller and the Title Company on or prior to the earlier of (a) ten (10) days following the date upon which the Purchaser receives the Seller's written notice of the destruction or damage or (b) the Date of Closing. If the Purchaser does not elect to so terminate this Agreement within the aforesaid period, or if the cost of repair is equal to or less than $250,000, then: (i) this Agreement shall remain in full force and effect, (ii) the parties shall proceed to the Closing with a reduction in the Purchase Price at Closing equal to the cost of such repair (not to exceed $250,000), (iii) the Seller shall be entitled to receive and retain all insurance proceeds paid or payable on account of such damage or destruction and (iv) the Purchaser shall assume any obligation imposed on the landlord under the existing Lease Agreement to repair or restore the damaged improvements and at the Purchaser's sole expense.

9.2    Condemnation. In the event, at any time on or prior to the Date of Closing, any action or proceeding is filed under which the Property, or any portion thereof, may be taken pursuant to any law, ordinance, or regulation or by condemnation or the right of eminent domain, the Seller shall promptly give written notice thereof (which notice shall describe the type of action being taken against the Property, and which portions of the Property will be affected thereby) to the Purchaser and to the Purchaser and the Title Company. If the taking would substantially prevent the Purchaser from continuing the existing use of the Property, then the Purchaser shall have the right to terminate this Agreement by written notice to the Seller and the Title Company on or prior to the earlier of (a) ten (10) days following the date upon which the Purchaser receives the Seller's written notice of such action or proceeding; and (b) the Date of Closing. If the Purchaser does not elect to so terminate this Agreement within the aforesaid

25

period, this Agreement shall remain in full force and effect and the parties shall proceed to closing without any reduction or adjustment in the Purchase Price, except that all condemnation proceeds for such taking will be assigned to the Purchaser.

10.    **FAILURE OF CONDITIONS PRECEDENT; DEFAULT AND REMEDIES.**

10.1    Failure of Conditions Precedent. If any of the conditions precedent stated in Section 6 (Conditions Precedent to Closing) have not occurred or been satisfied on or before the Closing Date, the party in whose favor the relevant condition precedent runs may (a) terminate this Agreement by written notice to the appropriate party and the Title Company on or before the Closing Date, in which event the Title Company shall deliver the Deposit to the appropriate party and this Agreement shall terminate and neither party shall have any further obligations to the other except as specifically set forth in this Agreement, or (b) waive such conditions precedent and proceed to Closing.

10.2    Purchaser Default. If the Purchaser is in default of one or more of the Purchaser's obligations under this Agreement, then the Seller may give notice to Purchaser and the Title Company specifying the nature of the default. The Purchaser shall have five (5) business days after receiving such notice, but in no event beyond the Closing Date, within which to cure that default, unless such default is the failure to timely Close, in which case Purchaser shall have one (1) business day after receipt of notice to cure. IF THE PURCHASER FAILS TO CURE THAT DEFAULT WITHIN THAT PERIOD, THEN THE SELLER'S SOLE REMEDY FOR SUCH DEFAULT SHALL BE TO TERMINATE THIS AGREEMENT BY GIVING NOTICE OF SUCH TERMINATION TO PURCHASER AND THE TITLE COMPANY AND RECEIVE THE DEPOSIT AS LIQUIDATED DAMAGES. IF THE SELLER DOES SO TERMINATE THIS AGREEMENT, THEN THE TITLE COMPANY SHALL PAY THE DEPOSIT TO THE SELLER. THE PURCHASER AGREES THAT THE RETENTION OF THE DEPOSIT BY THE SELLER REPRESENTS A REASONABLE ESTIMATION AS OF THE EFFECTIVE DATE OF THE SELLER'S DAMAGES IN THE EVENT OF THE PURCHASER'S DEFAULT HEREUNDER, THAT ACTUAL DAMAGES WOULD BE IMPRACTICABLE OR EXTREMELY DIFFICULT TO ASCERTAIN, AND THAT THE PROVISION FOR LIQUIDATED DAMAGES HEREUNDER DOES NOT CONSTITUTE A PENALTY. THE PARTIES ACKNOWLEDGE THAT THESE DAMAGES HAVE BEEN SPECIFICALLY NEGOTIATED BETWEEN THEMSELVES AND ARE, AMONG OTHER THINGS, TO COMPENSATE THE SELLER FOR TAKING THE PROPERTY OFF THE MARKET, FOR THE SELLER'S COSTS AND EXPENSES ASSOCIATED WITH THIS AGREEMENT, AND FOR THE SELLER'S LOST OPPORTUNITY COSTS. THE PURCHASER HEREBY WAIVES THE RIGHTS AND BENEFITS OF ANY LAW, RULE, REGULATION, OR ORDER NOW OR HEREAFTER EXISTING THAT WOULD ALLOW THE PURCHASER TO CLAIM A REFUND OF THE DEPOSIT AS UNEARNED EARNEST MONEY, A PENALTY, OR FOR ANY OTHER REASON. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTIONS 3275 OR 3369, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO THE SELLER PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676, AND 1677. IF, NOTWITHSTANDING THE PROVISIONS HEREIN, A COURT DETERMINES THAT THE

SELLER IS NOT ENTITLED TO RETAIN THE DEPOSIT AS A RESULT OF THE PURCHASER'S DEFAULT HEREUNDER, THE SELLER SHALL BE ENTITLED TO SEEK ANY AND ALL DAMAGES PROVIDED BY LAW; PROVIDED, HOWEVER, THAT ANY RECOVERY THEREOF MAY NOT EXCEED THE AMOUNT OF THE DEPOSIT. Notwithstanding anything to the contrary above or in Section 10.3 (Liquidated Damages), the limitations of remedies in this Section 10.2 (Purchaser Default) shall not apply to any obligation of Purchaser hereunder (a) to indemnify, defend, and hold Seller harmless or (ii) in the event Seller is a "prevailing party," to pay the Seller's costs and expenses, including reasonable attorneys' fees, pursuant to Section 10.6 (Attorneys' Fees).

10.3   Liquidated Damages. THE SELLER AND THE PURCHASER AGREE THAT PAYMENT OF THE DEPOSIT TO THE SELLER UNDER THIS SECTION 10 (FAILURE OF CONDITIONS PRECEDENT; DEFAULT AND REMEDIES) SHALL BE AS LIQUIDATED DAMAGES AND NOT AS A PENALTY.

| | |
|---|---|
| _____ | _____ |
| Purchaser's Initials | Seller's Initials |

10.4   Seller Default. In the event the Seller shall (a) fail to sell, transfer, and assign the Property to the Purchaser in violation of the terms of this Agreement, or (b) fail to perform any other material obligation of the Seller hereunder, which is not cured within five (5) business days after notice from the Purchaser to Seller and the Title Company, or (c) breach any warranty made or granted by the Seller under this Agreement, which breach is not cured by the Closing Date, or (d) have misrepresented any fact, or omitted any fact which would make any of the representations of the Seller contained herein not true, accurate or complete in any material respect, Purchaser shall, as its sole and exclusive remedy, be entitled to declare this Agreement to be null and void and demand and receive the return of the Deposit by giving notice thereof to the Seller and the Title Company, whereupon neither party shall have any further rights, duties, or obligations hereunder except as otherwise provided herein and to request reimbursement from the Seller of the reasonable out-of-pocket expenses incurred by the Purchaser solely in connection with this Agreement (not including any fees, charges or expenses of any kind for any financing being procured by the Purchaser) from the Effective Date until notice of the Seller's default, not to exceed $15,000.00. The Purchaser specifically waives any and all right (a) to file or record any lis pendens or any other lien or encumbrance against the Property; (b) to specific performance or other equitable relief; or (c) to consequential or punitive damages.

10.4.1   Waiver of Default. If the Purchaser does not duly notify the Seller and the Title Company of the default, or does not give the Seller and the Title Company a notice of termination hereunder, then (a) the default shall be treated as waived by the Purchaser and (b) at the Closing, the Purchaser shall accept the Property subject to the default without any reduction in the Purchase Price and without any Claims against the Seller on account of the default.

10.5   Termination. Upon any termination of this Agreement pursuant to any right of a party to terminate set forth in this Agreement, (a) the Deposit shall be paid over to the party entitled to the same, (b) all documents deposited by the Purchaser and Seller into the Escrow shall be returned by the Title Company to the party depositing the same, and (c) all copies of all Property Documents provided to the Purchaser by the Seller shall be returned to the Seller,

SELLER IS NOT ENTITLED TO RETAIN THE DEPOSIT AS A RESULT OF THE PURCHASER'S DEFAULT HEREUNDER, THE SELLER SHALL BE ENTITLED TO SEEK ANY AND ALL DAMAGES PROVIDED BY LAW; PROVIDED, HOWEVER, THAT ANY RECOVERY THEREOF MAY NOT EXCEED THE AMOUNT OF THE DEPOSIT. Notwithstanding anything to the contrary above or in Section 10.3 (Liquidated Damages), the limitations of remedies in this Section 10.2 (Purchaser Default) shall not apply to any obligation of Purchaser hereunder (a) to indemnify, defend, and hold Seller harmless or (ii) in the event Seller is a "prevailing party," to pay the Seller's costs and expenses, including reasonable attorneys' fees, pursuant to Section 10.6 (Attorneys' Fees).

10.3    Liquidated Damages. THE SELLER AND THE PURCHASER AGREE THAT PAYMENT OF THE DEPOSIT TO THE SELLER UNDER THIS SECTION 10 (FAILURE OF CONDITIONS PRECEDENT; DEFAULT AND REMEDIES) SHALL BE AS LIQUIDATED DAMAGES AND NOT AS A PENALTY.

| _____ | _WH_____ |
| Purchaser's Initials | Seller's Initials |

10.4    Seller Default. In the event the Seller shall (a) fail to sell, transfer, and assign the Property to the Purchaser in violation of the terms of this Agreement, or (b) fail to perform any other material obligation of the Seller hereunder, which is not cured within five (5) business days after notice from the Purchaser to Seller and the Title Company, or (c) breach any warranty made or granted by the Seller under this Agreement, which breach is not cured by the Closing Date, or (d) have misrepresented any fact, or omitted any fact which would make any of the representations of the Seller contained herein not true, accurate or complete in any material respect, Purchaser shall, as its sole and exclusive remedy, be entitled to declare this Agreement to be null and void and demand and receive the return of the Deposit by giving notice thereof to the Seller and the Title Company, whereupon neither party shall have any further rights, duties, or obligations hereunder except as otherwise provided herein and to request reimbursement from the Seller of the reasonable out-of-pocket expenses incurred by the Purchaser solely in connection with this Agreement (not including any fees, charges or expenses of any kind for any financing being procured by the Purchaser) from the Effective Date until notice of the Seller's default, not to exceed $15,000.00. The Purchaser specifically waives any and all right (a) to file or record any lis pendens or any other lien or encumbrance against the Property; (b) to specific performance or other equitable relief; or (c) to consequential or punitive damages.

10.4.1    Waiver of Default. If the Purchaser does not duly notify the Seller and the Title Company of the default, or does not give the Seller and the Title Company a notice of termination hereunder, then (a) the default shall be treated as waived by the Purchaser and (b) at the Closing, the Purchaser shall accept the Property subject to the default without any reduction in the Purchase Price and without any Claims against the Seller on account of the default.

10.5    Termination. Upon any termination of this Agreement pursuant to any right of a party to terminate set forth in this Agreement, (a) the Deposit shall be paid over to the party entitled to the same, (b) all documents deposited by the Purchaser and Seller into the Escrow shall be returned by the Title Company to the party depositing the same, and (c) all copies of all Property Documents provided to the Purchaser by the Seller shall be returned to the Seller,

27

whereupon the parties will have no continuing liability to each other unless otherwise expressly stated in any provision of this Agreement.

      10.6   <u>Attorneys' Fees</u>. Notwithstanding anything to the contrary in this Agreement, in the event that either the Seller or the Purchaser, as the case may be, shall bring a lawsuit against the other party for breach of such party's obligations under this Agreement, the losing party shall pay the prevailing party's costs and expenses incurred in connection with such litigation, including reasonable attorneys' fees. The "prevailing party" shall be determined by the court hearing such matter.

11.     **NOTICES**. Any notice required or permitted to be given hereunder may be served by a party or its attorney and must be in writing and shall be deemed to be given when (a) hand delivered, or (b) one (1) business day after pickup by Emery Air Freight, United Parcel Service (Overnight) or Federal Express, or another similar overnight express service, or (c) transmitted by telecopy, facsimile, or electronic mail provided that confirmation of the receipt of same is noted upon transmission of same by the sender's telecopy machine or by e-mail records, and a counterpart of such notice is also delivered pursuant to one of the two manners specified in clause (a) or (b), above, in any case addressed to the parties at their respective addresses set forth below:

| | |
|---|---|
| If to Seller: | William Hoffman, Receiver |
| | 12707 High Bluff Drive, Suite 300 |
| | San Diego, California 92130 |
| | Telephone:   (858) 720-6701 |
| | Facsimile:   (858) 720-6705 |
| | E-mail:      bill.hoffman@trigild.com |
| | |
| With a copy to: | Kelley A. McLaren |
| | 12707 High Bluff Drive, Suite 300 |
| | San Diego, California 92130 |
| | Telephone:   (858) 720-6721 |
| | Facsimile:   (858) 876-6721 |
| | E-mail:      kelley.mclaren@trigild.com |
| | |
| With a copy to: | CWCapital Asset Management LLC, Special Servicer |
| | 7501 Wisconsin Avenue, Suite 500, West |
| | Bethesda, Maryland 20814 |
| | Attn:       Legal Department |
| | Telephone:   (202) 715-9533 |
| | Facsimile:   (202) 715-9699 |
| | E-mail:      nphelps@cwcapital.com |

| With a copy to: | Jeffer Mangels Butler & Mitchell LLP |
| | Two Embarcadero Center, Fifth Floor |
| | San Francisco, California 94111-381324 |

With a copy to:

Jeffer Mangels Butler & Mitchell LLP
Two Embarcadero Center, Fifth Floor
San Francisco, California 94111-381324
Attn:          Robert B. Kaplan, Esq.
Telephone:     (415) 398-8080
Facsimile:     (415) 398-5584
E-mail:        rbk@jmbm.com

If to Purchaser:

c/o Nearon Enterprises, LLC
500 La Gonda Way, Suite 210
Danville, California 94526
Attn:   Greg Chabolla and Tony Perino
Telephone: (925) 743-3300
Facsimile: (925) 743-3303
E-mail: gchabolla@nearon.com; tperino@nearon.com

With a copy to:

Telles, Walker & Kochenderfer, LLP
1350 Treat Blvd., Suite 400
Walnut Creek, CA 94597
Attn:   Robert L. Telles, Jr., Esq.
Telephone:  (925) 937-0660
Facsimile:  (925) 943-1164
E-mail:  rtelles@twklaw.com

First American Title Insurance Company
National Commercial Services
1825 Eye Street, NW, Suite 302
Washington, D.C. 20006
Attn:          Brian Lobuts
Telephone:     202-530-1804
Facsimile:     202-530-1433
E-mail:        blobuts@firstam.com

or in each case to such other address as either party may from time to time designate by giving notice in writing pursuant to this Section 11 (Notices) to the other party. Telephone numbers and e-mail addresses are for informational purposes only. Effective notice will be deemed given only as provided above, except as otherwise expressly provided in this Agreement.

12.    **MISCELLANEOUS.**

12.1    Entire Agreement. This Agreement, together with the Exhibits and Schedules attached hereto, all of which are incorporated by reference, is the entire agreement between the parties with respect to the subject matter hereof, and no alteration, modification, or interpretation hereof shall be binding unless in writing and signed by both parties.

29

12.2 <u>Severability</u>. If any provision of this Agreement or its application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

12.3 <u>Applicable Law</u>. This Agreement shall be construed and enforced in accordance with the internal laws of the State of California.

12.4 <u>Assignability</u>. The Purchaser may not, directly or indirectly, assign or transfer any of the Purchaser's rights, obligations and interests under this Agreement to any person or entity without the prior written consent or approval of the Seller, which consent or approval must be requested in writing and received by the Seller not less than five (5) business days prior to the Closing Date and which consent may be given in the Seller's sole and absolute discretion, provided, however, that the Seller hereby consents to the Purchaser's assignment of the Purchaser's rights, obligations, and interests under this Agreement to an entity in which the Purchaser maintains a controlling economic interest, so long as notice of said assignment is provided not less than five (5) business days prior to the Closing Date. Upon any such assignment or other transfer, the Purchaser and such assignee or transferee shall be jointly and severally liable for the obligations of the Purchaser under this Agreement, which liability shall survive the assignment or transfer and the Closing.

12.5 <u>Successors Bound</u>. This Agreement shall be binding upon and inure to the benefit of the Purchaser and the Seller and their respective successors and permitted assigns.

12.6 <u>No Public Disclosure</u>. Prior to the Closing, all press releases or other dissemination of information to the media or responses to requests from the media for information relating to the transaction contemplated herein shall be subject to the prior written consent of the Purchaser and the Seller.

12.7 <u>Captions; Interpretation</u>. The captions in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the scope or content of any of its provisions. Whenever the context may require, words used in this Agreement shall include the corresponding feminine, masculine, or neuter forms, and the singular shall include the plural and vice versa. "Including" and the like are not limiting; and "or" is not exclusive unless expressly stated to be so; "hereof", "herein", and the like refer to this Agreement as a whole and not to any particular section, paragraph, or provision hereof. Unless the context expressly indicates otherwise, all references to "section" are to sections of this Agreement.

12.8 <u>No Partnership</u>. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the parties or their successors in interest or permitted assigns.

12.9 <u>Time of Essence</u>. Time is of the essence with respect to the performance of the obligations of the Seller and the Purchaser under this Agreement.

12.10   Counterparts. This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

12.11   Recordation. The Purchaser and the Seller agree not to record this Agreement or any memorandum hereof.

12.12   Proper Execution. This Agreement shall have no binding force and effect on either party unless and until both the Purchaser and the Seller shall have executed and delivered this Agreement.

12.13   Waiver. No waiver of any breach of any agreement or provision contained herein shall be deemed a waiver of any preceding or succeeding breach of any other agreement or provision herein contained. No extension of time for the performance of any obligation or act shall be deemed an extension of time for the performance of any other obligation or act.

12.14   Business Days. If any date herein set forth for the performance of any obligations by the Seller or the Purchaser or for the delivery of any instrument or notice as herein provided should fall on a Saturday, Sunday or Legal Holiday (hereinafter defined), the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such Saturday, Sunday, or Legal Holiday. As used herein, the term "**Legal Holiday**" shall mean any local or federal holiday on which post offices are closed in the District of Columbia.

12.15   Limitation of Liability. No present or future partner, director, officer, member, shareholder, employee, advisor, affiliate, servicer, or agent of or in the Seller or any affiliate of the Seller will have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter. The limitations of liability contained in this Section 12.15 (Limitation of Liability) will survive the termination of this Agreement or the Closing, as applicable, and are in addition to, and not in limitation of, any limitation on liability applicable to either party provided elsewhere in this Agreement or by law or by any other contract, agreement or instrument. In no event will the Seller be liable for any consequential, exemplary, or punitive damages under any circumstances in connection with this Agreement or the transaction contemplated hereby.

12.16   Back-Up Contracts. Notwithstanding anything herein to the contrary, the Seller reserves the right to continue marketing the Property for sale and to entertain letters of intent regarding the sale of the Property while this Agreement is outstanding, provided the Seller shall not enter into any binding back-up agreements with respect to the sale of the Property for so long as this Agreement is in force.

12.17   Jurisdiction and Venue. In any action arising out of or connected with this Agreement, the parties hereby expressly consent to the personal jurisdiction of, and venue for any action related to this Agreement in, the Court, and also consent to service of process by any means authorized by governing state law.

31

12.18  Reference.

12.18.1  To the extent that the provisions of Section 12.17 (Jurisdiction and Venue) of this Agreement are found to be unenforceable, any controversy or Claim between the parties, including those arising out of or relating or incidental to this Agreement or any other agreements or instruments relating hereto or delivered in connection herewith, whether in contract, tort, or otherwise (any of the forgoing, a "**Dispute**"), must, at the request of either party, be referred to a referee in accordance with California Code of Civil Procedure sections 638, *et seq.* The parties shall designate to the relevant court (the "**Alternative Court**") a single neutral referee, who must be a retired state or federal court judge with at least five years of judicial experience in civil matters.  If the parties cannot agree upon a referee, the Alternative Court is to appoint a referee with those qualifications. The referee so designated or appointed is to prepare written findings of fact and conclusions of law. Judgment upon the award of that referee is to be entered in the Alternative Court. The pursuit of a provisional or ancillary remedy will not constitute a waiver of the right of any party, including the plaintiff, to require reference to a referee if the other party contests that action for judicial relief. This Section 12.18 (Reference) will not limit the right of either party to exercise self-help remedies, or to obtain provisional or ancillary remedies from the Alternative Court, before, during, or after the pendency of any referred proceeding. The exercise of a remedy does not waive the right of either party to resort to or require reference to a referee.

12.18.2  Where that referee determines that there is a prevailing party in the referred Dispute, that referee is to assess against the non-prevailing party all expenses of the reference as well as all other reasonable out-of-pocket-expenses of the prevailing party.

12.19  Waiver of Jury Trial. To the fullest extent permitted by applicable law, the parties each hereby knowingly, voluntarily and intentionally waive any right (whether arising under the Constitution of the United States or that of the State of California or any other state, or under any foreign jurisdiction, under any statutes regarding or rules of civil procedure applicable in any state, federal, or foreign legal proceeding, under common law, or otherwise) to demand or have a trial by jury of any Dispute ; and each party agrees and consents that any Dispute that is not the subject of a reference pursuant to Section 12.18 (Reference) shall be decided by the Court without a jury, and that any other party to this Agreement may file an original counterpart or a copy of this Agreement with any court as written evidence of such waiver of right to trial by jury. The parties acknowledge and agree that they have received full and sufficient consideration for this provision (and each other provision of each other related document to which they are a party) and that this provision is a material inducement for the Seller's accepting this Agreement. By waiving a jury trial, the parties intend claims and disputes to be resolved by a judge acting without a jury in order to avoid the delays, expenses and risks of mistaken interpretations which each party acknowledges to be greater with jury trials than with non-jury trials.

_____        _____  **(Initials)**
**The Seller**                                 **The Purchaser**

12.20  Prohibited Persons and Transactions. The Purchaser represents and warrants to the Purchaser's knowledge  that (a) the Purchaser is not a Prohibited Person (defined below); (b)

32

12.18  Reference.

12.18.1  To the extent that the provisions of Section 12.17 (Jurisdiction and Venue) of this Agreement are found to be unenforceable, any controversy or Claim between the parties, including those arising out of or relating or incidental to this Agreement or any other agreements or instruments relating hereto or delivered in connection herewith, whether in contract, tort, or otherwise (any of the forgoing, a "**Dispute**"), must, at the request of either party, be referred to a referee in accordance with California Code of Civil Procedure sections 638, *et seq.* The parties shall designate to the relevant court (the "**Alternative Court**") a single neutral referee, who must be a retired state or federal court judge with at least five years of judicial experience in civil matters.  If the parties cannot agree upon a referee, the Alternative Court is to appoint a referee with those qualifications. The referee so designated or appointed is to prepare written findings of fact and conclusions of law. Judgment upon the award of that referee is to be entered in the Alternative Court. The pursuit of a provisional or ancillary remedy will not constitute a waiver of the right of any party, including the plaintiff, to require reference to a referee if the other party contests that action for judicial relief. This Section 12.18 (Reference) will not limit the right of either party to exercise self-help remedies, or to obtain provisional or ancillary remedies from the Alternative Court, before, during, or after the pendency of any referred proceeding. The exercise of a remedy does not waive the right of either party to resort to or require reference to a referee.

12.18.2  Where that referee determines that there is a prevailing party in the referred Dispute, that referee is to assess against the non-prevailing party all expenses of the reference as well as all other reasonable out-of-pocket-expenses of the prevailing party.

12.19  Waiver of Jury Trial. To the fullest extent permitted by applicable law, the parties each hereby knowingly, voluntarily and intentionally waive any right (whether arising under the Constitution of the United States or that of the State of California or any other state, or under any foreign jurisdiction, under any statutes regarding or rules of civil procedure applicable in any state, federal, or foreign legal proceeding, under common law, or otherwise) to demand or have a trial by jury of any Dispute ; and each party agrees and consents that any Dispute that is not the subject of a reference pursuant to Section 12.18 (Reference) shall be decided by the Court without a jury, and that any other party to this Agreement may file an original counterpart or a copy of this Agreement with any court as written evidence of such waiver of right to trial by jury. The parties acknowledge and agree that they have received full and sufficient consideration for this provision (and each other provision of each other related document to which they are a party) and that this provision is a material inducement for the Seller's accepting this Agreement. By waiving a jury trial, the parties intend claims and disputes to be resolved by a judge acting without a jury in order to avoid the delays, expenses and risks of mistaken interpretations which each party acknowledges to be greater with jury trials than with non-jury trials.

_____   _____  (Initials)
**The Seller**              **The Purchaser**

12.20  Prohibited Persons and Transactions. The Purchaser represents and warrants to the Purchaser's knowledge  that (a) the Purchaser is not a Prohibited Person (defined below); (b)

32

none of its investors, affiliates, or brokers or other agents or representatives (if any), acting or benefiting in any capacity in connection with this Agreement is a Prohibited Person; (c) the funds or other assets the Purchaser will transfer to the Seller under this Agreement are not the property of, or beneficially owned, directly or indirectly, by a Prohibited Person; and (d) the funds or other assets Purchaser will transfer to Seller under this Agreement are not the proceeds of specified unlawful activity as defined by 18 U.S.C. § 1956(c)(7). "**Prohibited Person**" means any of the following: (a) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "**Executive Order**"); (b) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (c) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") at its official website, http://www.treas.gov/offices/enforcement/ofac; (d) a person or entity that is otherwise the target of any economic sanctions program currently administered by OFAC; or (e) a person or entity that is affiliated with any person or entity identified in clause (a), (b), (c), or (d) above. The foregoing representations shall survive Closing and any termination of this Agreement.

12.21   Execution; Counterparts. This Agreement may be executed by facsimile or delivery of other electronic image with original initials and signatures to be provided thereafter as soon as is practicable in two or more counterparts, all of which, whether facsimile, other electronic image, or original, are deemed to be an original of this document, but all of which together shall constitute one and the same agreement. The failure of any party to deliver any such originals will not invalidate its prior execution hereof as so permitted. For all purposes, including delivery of this Agreement, duplicate unexecuted pages of any counterparts may be discarded and the remaining pages assembled as one document.

12.22   Tax-Free Exchange. If the Purchaser notifies the Seller not less than ten (10) days prior to the Closing Date that the Purchaser wishes to attempt to effectuate a "tax-free" exchange pursuant to Section 1031 of the Internal Revenue Code in connection with the transaction contemplated in this Agreement, the Seller shall cooperate with the Purchaser (including, without limitation, executing applicable documents), at no cost, expense, or liability to the Seller, in the Purchaser's attempt to effectuate such exchange, but the Seller makes no representations to the Purchaser that any such exchange shall be treated as "tax-free" by the Internal Revenue Service. The Purchaser agrees to indemnify the Seller from all liability with respect to any action which the Purchaser requests the Seller to take pursuant to this Section and to reimburse the Seller for all fees, costs, and expenses incurred by the Seller as a result of the Purchaser's election to participate in a Section 1031 exchange. The Seller shall not be required to hold title to any real estate or other asset in order to cooperate with the Purchaser's Section 1031 exchange. The provisions of this Section shall survive the Closing. Without limiting the effect of any of the foregoing provisions, the Purchaser and the Seller agree that: (i) the failure of the exchange to qualify as a tax-deferred exchange shall not constitute grounds for rescission by either party of this Agreement and shall not be deemed to be a failure of consideration, (ii) the Closing Date shall not be extended or accelerated to accommodate the exchange party, (iii) all conditions of the Purchaser's performance under this Agreement shall remain conditions of the exchange

33

party's performance under this Agreement (waivable only by the initial Purchaser), (iv) all Closing Documents to be executed by the Seller for the benefit of the Purchaser shall be executed and delivered by the Seller directly or through escrow to the initial Purchaser, (v) the Purchaser shall not be released from any liability under this Agreement, (vi) the Seller shall not be required to take an assignment of any purchase agreement for purposes of consummating the exchange, (vii) the rights and obligations the parties under this Agreement shall not be enlarged or diminished or in any way affected in any manner, and (viii) neither the Seller nor the Purchaser shall be responsible for compliance with or be deemed to have warranted to the other party that the exchange in fact complies with Section 1031 of the Internal Revenue Code.

13. **ESCROW AGREEMENT.**

13.1    Deposit. The Title Company agrees to deposit the Deposit in an interest bearing account, subject to the receipt from the Purchaser of a form W-9 for the purposes of investing said funds and to hold and disburse said funds, and any interest earned thereon, as hereinafter provided. Upon written notification from the Seller or the Purchaser in accordance with the terms of this Agreement, the Title Company shall release the funds in accordance with and pursuant to the written instructions. In the event of a dispute between any of the parties hereto sufficient in the sole discretion of the Title Company to justify its doing so, the Title Company shall be entitled to tender unto the registry or custody of the Court all money or property in its hands held under the terms of this Agreement, together with such legal pleading as it deems appropriate, and thereupon be discharged.

13.2    Title Company. The Seller and The Purchaser covenant and agree that in performing any of its duties under this Agreement, the Title Company shall not be liable for any loss, costs, or damage which it may incur as a result of serving as the escrow agent or holder hereunder, except for any loss, costs, or damage arising out of its willful default or gross negligence. Accordingly, other than with respect to any title policy issued by it, the Title Company shall not incur any liability with respect to (a) any action taken or omitted to be taken in good faith upon advice of its counsel given with respect to any questions relating to its duties and responsibilities, or (b) to any action taken or omitted to be taken in reliance upon any document, including any written notice of instruction provided for in this Agreement, not only as to its due execution and the validity and effectiveness of its provisions, but also to the truth and accuracy of any information contained therein, which the Title Company shall in good faith believe to be genuine, to have been signed or presented by a proper person or persons and to conform with the provisions of this Agreement.

13.3    Indemnity. The Seller and the Purchaser hereby agree to indemnify and hold harmless the Title Company against any and all losses, claims, damages, liabilities, and expenses, including reasonable costs of investigation and attorneys' fees and disbursements, which may be imposed upon or incurred by the Title Company in connection with its serving as the escrow agent or holder hereunder, except for any loss, costs, or damage arising out of its willful default or gross negligence or under any title policy issued by it. The provisions of this Section 13.3 (Indemnity) shall survive a termination of this Agreement.

[Signature page follows]

34

IN WITNESS WHEREOF, the Purchaser, the Seller, and the Title Company have executed this Agreement effective as of the date first set forth above.

**SELLER:**

WILLIAM J. HOFFMAN, not in his individual capacity but solely in his capacity as court-appointed Receiver over the specific assets of DDR MDT MV Garden Grove LP, a Delaware limited partnership, appointed by FINAL ORDER APPOINTING RECEIVER EX PARTE AND PRELIMINARY INJUNCTION IN AID OF RECEIVER, filed August 24, 2010, in the United States District Court for the Northern District of California, Case No. CV 10-3493EMC

_____

**PURCHASER:**

NEARON ENTERPRISES, LLC, a California limited liability company

By:_____
Name:_____
Title:_____

**TITLE COMPANY:**

FIRST AMERICAN TITLE INSURANCE COMPANY

By:_____
Name:_____
Title:_____

35

Signatures Page

IN WITNESS WHEREOF, the Purchaser, the Seller, and the Title Company have executed this Agreement effective as of the date first set forth above.

**SELLER:**

WILLIAM J. HOFFMAN, not in his individual capacity but solely in his capacity as court-appointed Receiver over the specific assets of DDR MDT MV Garden Grove LP, a Delaware limited partnership, appointed by FINAL ORDER APPOINTING RECEIVER EX PARTE AND PRELIMINARY INJUNCTION IN AID OF RECEIVER, filed August 24, 2010, in the United States District Court for the Northern District of California, Case No. CV 10-3493EMC

_____

**PURCHASER:**

NEARON ENTERPRISES, LLC, a California limited liability company

By: _____
Name: Gregory Chatoalla
Title: Co-President + CFO

**TITLE COMPANY:**

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____
Name: _____
Title: _____

35

Signatures Page

IN WITNESS WHEREOF, the Purchaser, the Seller, and the Title Company have executed this Agreement effective as of the date first set forth above.

**SELLER:**

WILLIAM J HOFFMAN, not in his individual capacity but solely in his capacity as court-appointed Receiver over the specific assets of DDR MDT MV Garden Grove LP, a Delaware limited partnership, appointed by FINAL ORDER APPOINTING RECEIVER EX PARTE AND PRELIMINARY INJUNCTION IN AID OF RECEIVER, filed August 24, 2010, in the United States District Court for the Northern District of California, Case No. CV 10-3493EMC

_____

**PURCHASER:**

NEARON ENTERPRISES, LLC, a California limited liability company

By: _____
Name: Gregory Chabolla
Title: Co-President + CFO

**TITLE COMPANY:**

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____
Name: Joshua Slon
Title: Counsel

35

Signatures Page

## SCHEDULE 1.1.1

### Real Property Description

PARCEL A:

PARCEL 2 AS SHOWN ON PARCEL MAP NO. 83-505, FILED IN BOOK 180 PAGE(S) 23 AND 24, OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.   EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE CITY OF GARDEN GROVE BY DEED RECORDED APRIL 14, 2005 AS INSTRUMENT NO. 05-283573, OFFICIAL RECORDS.

[APN: 101-621-17]

PARCEL B:

AN APPURTENANT NONEXCLUSIVE EASEMENT OVER, ACROSS, IN, UNDER AND THROUGH PARCELS 1, 3 AND 4, AS SHOWN ON A MAP FILED IN BOOK 160, PAGES 13 AND 14 OF PARCEL MAPS IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA, FOR INGRESS, EGRESS AND ACCESS. TO THE COMMON AREA, AND FOR THE USES AND PURPOSES SET FORTH IN SECTION 2.2 OF THAT CERTAIN "GRANT OF RECIPROCAL EASEMENTS AND DECLARATION OF COVENANTS RUNNING WITH THE LAND" RECORDED AUGUST 21, 1981 IN BOOK 14191, PAGE 1390 AND MODIFIED BY DOCUMENT RECORDED APRIL,14, 2005 AS INSTRUMENT NO. 2005-283574 OF OFFICIAL RECORDS OF SAID ORANGE COUNTY.

PARCEL C:

ALL THOSE CERTAIN RESERVATIONS, INTEREST AND EASEMENTS IN FAVOR OF THE ABOVE DESCRIBED PROPERTY AS SET FOR IN THAT CERTAIN DOCUMENT ENTITLED DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATIONS OF EASEMENTS AS SHOWN IN DOCUMENT RECORDED JUNE 24, 1993 AS INSTRUMENT NO. 93-0423011, UPON AND SUBJECT TO ALL THE TERMS PROVISIONS THEREIN CONTAINED.

## SCHEDULE 3.3

### Property Documents

Copies of the following will be delivered to Purchaser to the extent that they exist and are in the Seller's possession.

1.  Existing Survey;

2.  Lender's title policy;

3.  Current real property tax statements;

4.  Contracts;

5.  Phase 1 Environmental Reports;

6.  Lease(s);

7.  Current-year financials and rent roll;

8.  Current preliminary report; and

9.  Receiver Order.

## SCHEDULE 3.7

### Schedule of Contracts

Purchaser shall review the Contracts during the Due Diligence Period and determine the accuracy or inaccuracy of any information provided herein. PURCHASER ACKNOWLEDGES THAT PURCHASER IS PURCHASING THE PROPERTY BASED SOLELY UPON PURCHASER'S OWN INDEPENDENT INVESTIGATIONS AND FINDINGS AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY SELLER OR SELLER'S AGENTS OR CONTRACTORS.

Contracts, as defined in Section 3.7, in Seller's possession or of which Seller is aware:

Letter Agreement dated October 20, 2010, between Seller and Ernst & Young LLP ("E&Y") for tax advisory services pertaining to the Property and other properties subject to the Receivership.

Orange County Clerk of the Board, Assessment Appeals Division - Agent's Authorization Form dated September 13, 2011, executed by Seller appointing John Corum of E&Y as Seller's agent.

Schedule 3.7                                             1

SF 1225251v7

## SCHEDULE 4.6

### Schedule of Leases

Purchaser shall review the Leases during the Due Diligence Period and determine the accuracy or inaccuracy of any information provided herein. PURCHASER ACKNOWLEDGES THAT PURCHASER IS PURCHASING THE PROPERTY BASED SOLELY UPON PURCHASER'S OWN INDEPENDENT INVESTIGATIONS AND FINDINGS AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY SELLER OR SELLER'S AGENTS OR CONTRACTORS.

### Existing Lease:

Lease Agreement Dated May 17, 2010 by and between DDR MDT MV Garden Grove LP, a Delaware limited partnership, as Landlord, and Burlington Coat Factory of California, LLC, a California limited partnership, as Tenant.

## SCHEDULE 7.3.3

### Schedule of Tenants' Deposits

Purchaser shall review the Leases during the Due Diligence Period and determine the accuracy or inaccuracy of any information provided herein. PURCHASER ACKNOWLEDGES THAT PURCHASER IS PURCHASING THE PROPERTY BASED SOLELY UPON PURCHASER'S OWN INDEPENDENT INVESTIGATIONS AND FINDINGS AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY SELLER OR SELLER'S AGENTS OR CONTRACTORS.

No Tenant Deposit was paid to Seller, and the Credit Tenant Lease does not provide for a Tenant Deposit.

## SCHEDULE 8.1.1

### Form of Grant Deed

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL DOCUMENT TO:

Space Above This Line For Recorder's Use Only

APN: 101-621-17

File No.:*

### GRANT DEED

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, DDR MDT MV GARDEN GROVE LP, a Delaware limited partnership, by WILLIAM J. HOFFMAN, not in his individual capacity but solely in his capacity as court-appointed Receiver over the specific assets of DDR MDT MV Garden Grove LP, a Delaware limited partnership, appointed by FINAL ORDER APPOINTING RECEIVER EX PARTE AND PRELIMINARY INJUNCTION IN AID OF RECEIVER, filed August 24, 2010, in the United States District Court for the Northern District of California, Case No. CV 10-3493EMC hereby GRANTS to NEARON ENTERPRISES, LLC, a California limited liability company ("**Grantee**"), the following described real property in the City of Garden Grove, County of Orange, State of California (the "**Property**").

**See Exhibit A attached hereto and incorporated herein by this reference.**

This grant is made expressly subject to the covenants, conditions, easements, encumbrances and other matters set forth in <u>Exhibit B</u> attached hereto and incorporated herein by this reference.

[signature page follows]

Schedule 8.1.1

1

IN WITNESS WHEREOF, Grantor has caused this Deed to be executed as of the day and year first above written.

**Grantor:**

DDR MDT MV GARDEN GROVE LP, a Delaware limited partnership

By:_____

WILLIAM J. HOFFMAN, not in his individual capacity but solely in his capacity as court-appointed Receiver over the specific assets of DDR MDT MV Garden Grove LP, a Delaware limited partnership, appointed by FINAL ORDER APPOINTING RECEIVER EX PARTE AND PRELIMINARY INJUNCTION IN AID OF RECEIVER, filed August 24, 2010, in the United States District Court for the Northern District of California, Case No. CV 10-3493EMC

## SCHEDULE 8.1.2

### Form of Assignment and Assumption Agreement

### ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT, dated _____, 2011, by and between DDR MDT MV GARDEN GROVE LP, a Delaware limited partnership, by WILLIAM J. HOFFMAN, not in his individual capacity but solely in his capacity as court-appointed Receiver over the specific assets of DDR MDT MV Garden Grove LP, a Delaware limited partnership, appointed by FINAL ORDER APPOINTING RECEIVER EX PARTE AND PRELIMINARY INJUNCTION IN AID OF RECEIVER, filed August 24, 2010, in the United States District Court for the Northern District of California, Case No. CV 10-3493EMC ("**Assignor**"), and NEARON ENTERPRISES, LLC, a California limited liability company ("**Assignee**").

A.    Assignor and Assignee entered into that certain Purchase and Sale Agreement ("**Agreement**") dated December 1, 2011, for the sale and purchase of certain Property as defined in the Agreement consisting of, among other things, the real property legally described on Exhibit A attached hereto and made a part hereof. Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to such terms in the Agreement.

B.    Assignor desires to quitclaim unto Assignee all of Assignor's right, title and interest in and to the Intangible Property, the Leases, the Contracts and the Tenants' Deposits as hereinafter provided.

C.    Assignee desires to assume the duties and obligations of Assignor with respect to the property described in Section 1, below.

NOW, THEREFORE, in accordance with the Agreement and in consideration of the sum of Ten Dollars ($10.00), the sufficiency and receipt of which are hereby acknowledged, the parties do hereby covenant and agree as follows and take the following actions:

1.    Assignor does hereby quitclaim unto Assignee all of the Assignor's right, title and interest in and to the following:

(a)    the Intangible Property;

(b)    the Leases;

(c)    the Contracts; and

(d)    the Tenants' Deposits.

2.    THE FOREGOING PROPERTY IS BEING QUITCLAIMED "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AS OF THE DATE OF THIS ASSIGNMENT AND ASSUMPTION AGREEMENT, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY

PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED. ASSIGNOR SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE INTANGIBLE PROPERTY OR ASSIGNOR'S TITLE THERETO. ASSIGNEE IS HEREBY THUS ACQUIRING THE FOREGOING PROPERTY BASED SOLELY UPON ASSIGNEE'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTIONS OF THAT PROPERTY AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY ASSIGNOR OR ASSIGNOR'S AGENTS OR CONTRACTORS.

3.    Assignee hereby accepts the foregoing assignment and hereby assumes all duties and obligations of Assignor for the period on and after the date of this Assignment and Assumption Agreement with respect to (a) the Intangible Property, (b) the Leases, (c) the Contracts, and (d) Tenants' Deposits (whether Assignee has received those deposits or interest or a credit therefor at Closing or not). Assignee shall defend, indemnify and hold harmless the Indemnified Parties from and against any and all Claims asserted against or incurred by Assignor in connection with any acts or omissions, on or after the date of this Assignment and Assumption Agreement, with respect to the Intangible Property, the Leases, the Contracts and the Tenants' Deposits assumed by Assignee hereunder.

4.    This Assignment and Assumption Agreement shall be (a) binding upon, and inure to the benefit of, the parties to this Assignment and Assumption Agreement and their respective heirs, legal representatives, successors and assigns, and (b) construed in accordance with the laws of the State of California, without regard to the application of choice of law principles, except to the extent such laws are superseded by federal law.

[signature page follows]

IN WITNESS WHEREOF, this Assignment and Assumption Agreement has been signed and delivered by the parties as of the date first above written.

**ASSIGNOR:**

DDR MDT MV GARDEN GROVE LP, a Delaware limited partnership

By:_____
WILLIAM J. HOFFMAN, not in his individual capacity but solely in his capacity as court-appointed Receiver over the specific assets of DDR MDT MV Garden Grove LP, a Delaware limited partnership, appointed by FINAL ORDER APPOINTING RECEIVER EX PARTE AND PRELIMINARY INJUNCTION IN AID OF RECEIVER, filed August 24, 2010, in the United States District Court for the Northern District of California, Case No. CV 10-3493EMC

**ASSIGNEE:**

NEARON ENTERPRISES, LLC, a California limited liability company

By:_____
Print Name:_____
Title:_____

## EXHIBIT A TO ASSIGNMENT AND ASSUMPTION AGREEMENT

Legal Description of Real Property

PARCEL A:

PARCEL 2 AS SHOWN ON PARCEL MAP NO. 83-505, FILED IN BOOK 180 PAGE(S) 23 AND 24, OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.  EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE CITY OF GARDEN GROVE BY DEED RECORDED APRIL 14, 2005 AS INSTRUMENT NO. 05-283573, OFFICIAL RECORDS.

[APN: 101-621-17]

PARCEL B:

AN APPURTENANT NONEXCLUSIVE EASEMENT OVER, ACROSS, IN, UNDER AND THROUGH PARCELS 1, 3 AND 4, AS SHOWN ON A MAP FILED IN BOOK 160, PAGES 13 AND 14 OF PARCEL MAPS IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA, FOR INGRESS, EGRESS AND ACCESS. TO THE COMMON AREA, AND FOR THE USES AND PURPOSES SET FORTH IN SECTION 2.2 OF THAT CERTAIN "GRANT OF RECIPROCAL EASEMENTS AND DECLARATION OF COVENANTS RUNNING WITH THE LAND" RECORDED AUGUST 21, 1981 IN BOOK 14191, PAGE 1390 AND MODIFIED BY DOCUMENT RECORDED APRIL,14, 2005 AS INSTRUMENT NO. 2005-283574 OF OFFICIAL RECORDS OF SAID ORANGE COUNTY.

PARCEL C:

ALL THOSE CERTAIN RESERVATIONS, INTEREST AND EASEMENTS IN FAVOR OF THE ABOVE DESCRIBED PROPERTY AS SET FOR IN THAT CERTAIN DOCUMENT ENTITLED DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATIONS OF EASEMENTS AS SHOWN IN DOCUMENT RECORDED JUNE 24, 1993 AS INSTRUMENT NO. 93-0423011, UPON AND SUBJECT TO ALL THE TERMS PROVISIONS THEREIN CONTAINED.

## SCHEDULE 8.1.8

### Form of Quitclaim Bill of Sale

### BILL OF SALE

DDR MDT MV GARDEN GROVE LP, a Delaware limited partnership, by WILLIAM J. HOFFMAN, not in his individual capacity but solely in his capacity as court-appointed Receiver over the specific assets of DDR MDT MV Garden Grove LP, a Delaware limited partnership, appointed by FINAL ORDER APPOINTING RECEIVER EX PARTE AND PRELIMINARY INJUNCTION IN AID OF RECEIVER, filed August 24, 2010, in the United States District Court for the Northern District of California, Case No. CV 10-3493EMC ("**Assignor**"), in accordance with the Purchase and Sale Agreement dated December 1, 2011 and in consideration of the sum of Ten Dollars ($10.00) (the sufficiency and receipt of which are hereby acknowledged), does hereby quitclaim unto NEARON ENTERPRISES, LLC, a California limited liability company ("**Assignee**"), all of Assignor's right, title and interest in and to all of the furniture, furnishings, fixtures, equipment and other tangible personal property that is now affixed to and/or located at the real property described in Exhibit A and used in connection with the management, operation, or repair of that real property (collectively, "**Personal Property**").

TO HAVE AND TO HOLD the Personal Property unto Assignee and Assignee's heirs, legal representatives, successors and assigns forever.

THE PERSONAL PROPERTY IS BEING QUITCLAIMED "**AS IS**", "**WHERE IS**", AND "**WITH ALL FAULTS**" AS OF THE DATE OF THIS BILL OF SALE, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED. ASSIGNOR SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE PERSONAL PROPERTY OR ASSIGNOR'S TITLE THERETO. ASSIGNEE IS HEREBY THUS ACQUIRING THE PERSONAL PROPERTY BASED SOLELY UPON ASSIGNEE'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTIONS OF THAT PROPERTY AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY ASSIGNOR OR ASSIGNOR'S AGENTS OR CONTRACTORS. ASSIGNOR HAS MADE NO AGREEMENT TO ALTER, REPAIR OR IMPROVE ANY OF THE PERSONAL PROPERTY.

[signature page follows]

IN WITNESS WHEREOF, Assignor and Assignee have signed and delivered this Bill of Sale as of the _____ day of _____, 2011.

**ASSIGNOR:**

DDR MDT MV GARDEN GROVE LP, a Delaware limited partnership

By:_____
WILLIAM J. HOFFMAN, not in his individual capacity but solely in his capacity as court-appointed Receiver over the specific assets of DDR MDT MV Garden Grove LP, a Delaware limited partnership, appointed by FINAL ORDER APPOINTING RECEIVER EX PARTE AND PRELIMINARY INJUNCTION IN AID OF RECEIVER, filed August 24, 2010, in the United States District Court for the Northern District of California, Case No. CV 10-3493EMC

**ASSIGNEE:**

NEARON ENTERPRISES, LLC, a California limited liability company

By:_____
Print Name:_____
Title:_____

## EXHIBIT A TO BILL OF SALE

Legal Description of Real Property

PARCEL A:

PARCEL 2 AS SHOWN ON PARCEL MAP NO. 83-505, FILED IN BOOK 180 PAGE(S) 23 AND 24, OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.   EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE CITY OF GARDEN GROVE BY DEED RECORDED APRIL 14, 2005 AS INSTRUMENT NO. 05-283573, OFFICIAL RECORDS.

[APN: 101-621-17]

PARCEL B:

AN APPURTENANT NONEXCLUSIVE EASEMENT OVER, ACROSS, IN, UNDER AND THROUGH PARCELS 1, 3 AND 4, AS SHOWN ON A MAP FILED IN BOOK 160, PAGES 13 AND 14 OF PARCEL MAPS IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA, FOR INGRESS, EGRESS AND ACCESS. TO THE COMMON AREA, AND FOR THE USES AND PURPOSES SET FORTH IN SECTION 2.2 OF THAT CERTAIN "GRANT OF RECIPROCAL EASEMENTS AND DECLARATION OF COVENANTS RUNNING WITH THE LAND" RECORDED AUGUST 21, 1981 IN BOOK 14191, PAGE 1390 AND MODIFIED BY DOCUMENT RECORDED APRIL,14, 2005 AS INSTRUMENT NO. 2005-283574 OF OFFICIAL RECORDS OF SAID ORANGE COUNTY.

PARCEL C:

ALL THOSE CERTAIN RESERVATIONS, INTEREST AND EASEMENTS IN FAVOR OF THE ABOVE DESCRIBED PROPERTY AS SET FOR IN THAT CERTAIN DOCUMENT ENTITLED DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATIONS OF EASEMENTS AS SHOWN IN DOCUMENT RECORDED JUNE 24, 1993 AS INSTRUMENT NO. 93-0423011, UPON AND SUBJECT TO ALL THE TERMS PROVISIONS THEREIN CONTAINED.

## SCHEDULE 8.1.9

### Form of Assignment of REA

RECORDING REQUESTED BY:
FIRST AMERICAN TITLE
INSURANCE COMPANY

AFTER RECORDING, MAIL
RECORDED DOCUMENT TO:

---

APN: 1015-071-06                    SPACE ABOVE THIS LINE FOR RECORDER'S USE

### ASSIGNMENT AND ASSUMPTION OF RECIPROCAL EASEMENT AGREEMENT

This Assignment and Assumption of Reciprocal Easement Agreement (this "**Assignment**") is made and entered into as of _____, 2011, by and between DDR MDT MV GARDEN GROVE LP, a Delaware limited partnership, by WILLIAM J. HOFFMAN, not in his individual capacity but solely in his capacity as court-appointed Receiver over the specific assets of DDR MDT MV Garden Grove LP, a Delaware limited partnership, appointed by FINAL ORDER APPOINTING RECEIVER EX PARTE AND PRELIMINARY INJUNCTION IN AID OF RECEIVER, filed August 24, 2010, in the United States District Court for the Northern District of California, Case No. CV 10-3493EMC, ("**Assignor**") and NEARON ENTERPRISES, LLC, a California limited liability company ("**Assignee**").

For good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby assign, transfer, set over and deliver unto Assignee all of Assignor's right, title, and interest in those certain instruments described on Exhibit B attached hereto (collectively, the "**REA**") which affect the real property legally described on Exhibit A attached hereto.

ASSIGNEE ACKNOWLEDGES AND AGREES, BY ITS ACCEPTANCE HEREOF, THAT, EXCEPT AS EXPRESSLY PROVIDED IN, AND SUBJECT TO THE LIMITATIONS CONTAINED IN, THAT CERTAIN PURCHASE AND SALE AGREEMENT, DATED AS OF NOVEMBER _____, 2011 (THE "**AGREEMENT**"), BY AND BETWEEN ASSIGNOR AND ASSIGNEE, ASSIGNOR'S INTEREST IN THE REA IS BEING CONVEYED "AS IS, WHERE IS" AND THAT ASSIGNOR HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE REA.

Except as otherwise expressly provided in the Agreement, by accepting this Assignment and by its execution hereof, Assignee assumes the payment and performance of, and agrees to pay, perform and discharge, all the debts, duties and obligations to be paid, performed or discharged by Assignor under the REA from and after the effective date hereof. Assignee shall indemnify, protect, defend and hold Assignor harmless from and against any and all claims, demands, liabilities, losses, costs, damages or expenses (including, without limitation, reasonable attorneys' fees and costs) arising out of or resulting from any breach or default by Assignee under the terms of the REA first arising on or after the date hereof.

Assignor shall indemnify, protect, defend and hold Assignee harmless from and against any and all claims, demands, liabilities, losses, costs, damages or expenses (including, without limitation, reasonable attorneys' fees and costs) arising out of or resulting from any breach or default by Assignor under the terms of the REA arising prior to the date hereof, but subject in all instances to the limitations contained in the Agreement.

This Assignment may be executed in any number of counterparts, each of which when taken together shall constitute one original Assignment.

DATED as of the date first written above.

ASSIGNOR:             DDR MDT MV GARDEN GROVE LP, a Delaware
                      limited partnership

                      By:_____
                         WILLIAM J. HOFFMAN, not in his individual
                         capacity but solely in his capacity as court-appointed
                         Receiver over the specific assets of DDR MDT MV
                         Garden Grove LP, a Delaware limited partnership,
                         appointed by FINAL ORDER APPOINTING
                         RECEIVER EX PARTE AND PRELIMINARY
                         INJUNCTION IN AID OF RECEIVER, filed August
                         24, 2010, in the United States District Court for the
                         Northern District of California, Case No. CV 10-
                         3493EMC

ASSIGNEE:             NEARON ENTERPRISES, LLC, a California limited
                      liability company

                      By:_____

                      Name:_____

                      Title:_____

**ACKNOWLEDGMENT**

STATE OF CALIFORNIA            )
                              )
COUNTY OF _____)


On _____, 2011, before me, _____,

a Notary Public, personally appeared WILLIAM J. HOFFMAN, who proved to me on the basis

of satisfactory evidence to be the person whose name is subscribed to the within instrument and

acknowledged to me that he executed the same in his authorized capacity, and that by his

signature on the instrument the person, or the entity upon behalf of which the person acted,

executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that

the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature _____


(SEAL)


Schedule 8.1.9                        3

## ACKNOWLEDGMENT

STATE OF CALIFORNIA        )
                                         )

COUNTY OF _____)


On _____, 2011, before me, _____,

a Notary Public, personally appeared _____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are

subscribed to the within instrument and acknowledged to me that he/she/they executed the same

in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument

the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that

the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature _____


(SEAL)


Schedule 8.1.9                                4

## EXHIBIT A TO ASSIGNMENT OF REA

<u>LEGAL DESCRIPTION OF LAND</u>

<u>PARCEL A</u>:

PARCEL 2 AS SHOWN ON PARCEL MAP NO. 83-505, FILED IN BOOK 180 PAGE(S) 23 AND 24, OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA.  EXCEPTING THEREFROM THAT PORTION CONVEYED TO THE CITY OF GARDEN GROVE BY DEED RECORDED APRIL 14, 2005 AS INSTRUMENT NO. 05-283573, OFFICIAL RECORDS.

[APN: 101-621-17]

<u>PARCEL B</u>:

AN APPURTENANT NONEXCLUSIVE EASEMENT OVER, ACROSS, IN, UNDER AND THROUGH PARCELS 1, 3 AND 4, AS SHOWN ON A MAP FILED IN BOOK 160, PAGES 13 AND 14 OF PARCEL MAPS IN THE OFFICE OF THE COUNTY RECORDER OF ORANGE COUNTY, CALIFORNIA, FOR INGRESS, EGRESS AND ACCESS. TO THE COMMON AREA, AND FOR THE USES AND PURPOSES SET FORTH IN SECTION 2.2 OF THAT CERTAIN "GRANT OF RECIPROCAL EASEMENTS AND DECLARATION OF COVENANTS RUNNING WITH THE LAND" RECORDED AUGUST 21, 1981 IN BOOK 14191, PAGE 1390 AND MODIFIED BY DOCUMENT RECORDED APRIL,14, 2005 AS INSTRUMENT NO. 2005-283574 OF OFFICIAL RECORDS OF SAID ORANGE COUNTY.

<u>PARCEL C</u>:

ALL THOSE CERTAIN RESERVATIONS, INTEREST AND EASEMENTS IN FAVOR OF THE ABOVE DESCRIBED PROPERTY AS SET FOR IN THAT CERTAIN DOCUMENT ENTITLED DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATIONS OF EASEMENTS AS SHOWN IN DOCUMENT RECORDED JUNE 24, 1993 AS INSTRUMENT NO. 93-0423011, UPON AND SUBJECT TO ALL THE TERMS PROVISIONS THEREIN CONTAINED.

**EXHIBIT B TO ASSIGNMENT OF REA**

<u>RECORDED RECIPROCAL EASEMENT DOCUMENTS</u>

Shopping Center Reciprocal Easement and Operation Agreement dated June 17, 1993 and recorded June 24, 1993 as Instrument No. 93-423011 of Official Records of Orange County, California, and amended in the document recorded April 14, 2005, as Instrument No. 2005000283575 of said Official Records.

**SCHEDULE 8.1.10**

Form of Tenant Estoppel Certificate

**TENANT ESTOPPEL CERTIFICATE**

To: WILLIAM J. HOFFMAN, not in his individual capacity but solely in his capacity as the duly appointed, qualified, and acting receiver in that certain action now pending in the United States District Court for the Northern District of California bearing Case No. CV 10-3493 and styled *Wells Fargo Bank, N.A., as Trustee, etc., v. DDR MDT MV Anaheim Hills, LP, etc., et al.*, pursuant to that certain Order Appointing Receiver Ex Parte and Preliminary Injunction in Aid of Receiver entered in the Action on August 24, 2010

| | | |
|---|---|---|
| Re: | Leased Premises: | 13092 Harbor Boulevard, City of Garden Grove, County of Orange, State of California (the **"Premises"**) |
| | Lease: | Lease Agreement Dated May 17, 2010 by and between DDR MDT MV Garden Grove LP, a Delaware limited partnership, as Landlord (the "**Landlord**"), and Burlington Coat Factory of California, LLC, a California limited partnership, as Tenant. (the **"Lease"**) |
| | Security Deposit: | N/A |

To Whom It May Concern:

As the current tenant under the Lease, the undersigned (the "**Tenant**") hereby certifies as follows:

1.    A true, complete, and correct copy of the Lease, including all amendments, modifications, supplements, additions, or changes thereof or thereto to date, is attached hereto as **Exhibit A**.

2.    The Tenant has accepted, is satisfied with, and commenced conducting business in the Premises, including all improvements, additions, and alterations thereto required to be made by the current or any prior landlord under the Lease (collectively, the "**Landlord**"). The Tenant is in sole and exclusive possession of the Premises and has not transferred, assigned, or sublet any interest in or portion of the Premises nor entered into any license or concession agreement with respect to any portion of the Premises.

3.    The Tenant is not in breach or default of its obligations under or any terms or conditions of the Lease, shall pay the full rent stipulated therein with no offset, defense, or claim of any kind, except as expressly permitted under the Lease. The Landlord has not been and is not presently in default under any of the terms, covenants, or provisions of the

Lease. The Landlord has satisfactorily complied with all of the requirements and conditions precedent to the commencement of the term of the Lease as specified therein.

        4.     All monthly installments of base rent, all additional rent, and all monthly installments of estimated additional rent have been paid when due through [_____], 2011; and the current monthly installment of base rent is $[_____]. No rent or other amounts called for under the Lease is currently due and payable and no monies have been paid to the Landlord in advance of the due date set forth in the Lease except one month's rent.  No security deposit has been paid to or deposited with Landlord.

        5.     The Lease is in full force and effect and constitutes the full and entire understanding and agreement between the Tenant and the Landlord pertaining to the Lease and the Premises. The Tenant does not hold any right of first refusal or option to purchase all or any portion of the Premises, or any other part of the Real Property, except as set forth in the Lease.

        6.     There have been no amendments, modifications, supplements, additions, or changes to or of the Lease other than reflected on **Exhibit A**, and all of those amendments, modifications, supplements, additions, and changes, if any, have been made to the satisfaction of the Tenant. The Tenant has received no notice of prior assignment, hypothecation, or pledge of rents or of the Lease, except for the benefit of any lender that currently holds a deed of trust encumbering the Real Property.

        7.     As of the date of this Tenant Estoppel Certificate, the Tenant has no lien, defense, charge, claim of offset, or other claims, whether under the Lease or otherwise, against rent or other charges due or to become due under the Lease.

        8.     The signing and delivery of this Tenant Estoppel Certificate by the Tenant does not require any consent, vote, or approval that has not been taken. Each person signing this Tenant Estoppel Certificate in a representative capacity individually represents and warrants to the recipient of this Tenant Estoppel Certificate that he or she has been duly authorized and empowered to do so.

        9.     The Tenant acknowledges and consents that (i) this Tenant Estoppel certificate may be delivered by the Landlord to a prospective purchaser of or lender with respect to the Real Property; (ii) any such purchaser or lender will rely on the statements contained herein in acquiring the Real Property and the Landlord's rights under the Lease or in making a loan to the Landlord or to any such purchaser, and in acquiring any assignment of the Lease and the rents due thereunder, whether directly or as collateral security, as applicable; and (iii) receipt by such purchaser or lender may be a condition of the acquisition of the Real Property or the making of that loan.

[Signature of the Tenant appears on the following page]

Dated: [_____], 2011

<u>TENANT</u>:

Burlington Coat Factory of California, LLC,
a California limited partnership

By:  Burlington Coat Factory Warehouse
      Corporation, its sole member

By: _____

Name: _____

Title: _____

**Exhibit A**
**Lease Agreement**

**[Attached]**